OTIS A. KITTLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35442. Promulgated October 19, 1953.

*Kenneth P. Dillon, Esq.*, for the petitioner.
*Edward H. Boyle, Esq.*, for the respondent.

80

OPINION.

BRUCE, *Judge:* Petitioner claims a net operating loss deduction for the calendar year 1945 under sections 23 (s) and 122 of the Internal Revenue Code,[1] based upon a net operating loss carry-back from the calendar year 1947. The first question for determination is whether petitioner's net loss incurred during 1947 in mine exploration and development work, amounting to $14,032.34, represents a loss incurred by petitioner in regularly carrying on a trade or business within the meaning of section 122 (d) (5).

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
   In computing net income there shall be allowed as deductions:
   *       *       *       *       *       *       *
   (s) NET OPERATING LOSS DEDUCTION.—For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122.

SEC. 122. NET OPERATING LOSS DEDUCTION.
   (a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).
   *       *       *       *       *       *       *
   (d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:
   *       *       *       *       *       *       *
   (5) Deducations otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. For the purposes of this paragraph deductions and gross income shall be computed with the exceptions, additions, and limitations specified in paragraphs (1) to (4) of this subsection. *  *  *

It is not disputed that during the calendar year 1947 petitioner suffered a net loss from his mining exploration work in the aggregate amount of $14,032.34, and that such net loss represented a proper deduction for the taxable year 1947. Respondent contends, however, that such loss was not incurred by petitioner in regularly carrying on a trade or business within the meaning of section 122 (d) (5). As a basis of his contention respondent argues that it is not possible from the record to ascertain what petitioner's business was, or what course he would have followed if ore had been discovered, so as to realize a profit or income. Assuming petitioner would have actively mined any discovery made or would have leased the mineral rights to third parties, respondent asserts the expenditures incurred in 1947 in connection with the discovery would not have been deductible as operating expenses but, pursuant to the requirements of Regulations 111, section 29.23 (m)–15,[2] would have been capital items recoverable only through deduction for depreciation and depletion, citing *Rialto Mining Corporation*, 25 B. T. A. 980, and *G. E. Cotton*, 25 B. T. A. 866. Respondent concedes that if it be assumed petitioner would have sold the mineral rights to third parties, petitioner would be in the business of selling mineral properties and the expenditures incurred in 1947 would have constituted operating expenses rather than the cost of each mine or mineral property.

Petitioner contends, however, that his business consisted of exploring and developing mineral properties as distinct from the business of commercial mining production and therefore that the loss incurred therein represents deductions otherwise allowed by law attributable to the operation of a trade or business regularly carried on within the meaning of section 122 (d) (5) of the Internal Revenue Code.

We agree with petitioner's position. That he followed a regular course of action cannot be denied. Beginning in 1946, after his release from the military service, and continuing through 1949, petitioner employed all his business energies and time in the exploration and development of mining properties. He established and maintained an office for such business, kept records of expenditures, and employed others to assist him. His working assets were the $10,000 or more which he allocated for such work, his engineering abilities, and personal services. The fact that he never realized any income from his activities (except an unexplained item of $36.04) does not of itself prevent such activities from constituting a trade or business.

[2] SEC. 29.23 (m)–15. ALLOWABLE CAPITAL ADDITIONS IN CASE OF MINES.—(a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

As respondent on brief has stated, the question of whether or not the net loss incurred in 1947 should be deemed attributable to the operation of a trade or business, cannot be held to turn upon petitioner's success or failure in discovering mineral properties. Nor do we think it material, under the facts of this case, what course petitioner would have pursued had he found a commercially productive ore body. Both petitioner and Kral testified that had such an ore body been discovered the beneficiation thereof would have been the subject of an entirely new enterprise and that they would have continued in their activities of exploring and developing other ore bodies. Had he discovered an ore body in any of the properties examined worthy of commercial production his interest therein would unquestionably have been capable of evaluation and such evaluation would have been recognized by way of cash, stock, or partnership interest by any company organized to exploit such ore deposits. Such valuation would have represented income of petitioner's business of exploration and development of mineral properties. Petitioner's business was not merely that of a particular venture or development of a particular mining lease as in the *Rialto* and *Cotton* cases, *supra*. The various mining properties explored were not isolated transactions but part of his regular business and the losses incurred were from the operation of a business regularly carried on by him. Such losses incurred in 1947 are accordingly eligible for carry-back to the calendar year 1945 under the provisions of sections 23 (s) and 122 of the Internal Revenue Code. See *Oscar K. Eysenbach*, 10 B. T. A. 716; *Royal W. Irwin*, 37 B. T. A. 51; *Henry E. Sage*, 15 T. C. 299.

Having determined that the net loss incurred by petitioner during 1947 in mining exploration and development work, amounting to $14,032.34, represents a loss incurred in regularly carrying on a trade or business and as such eligible for carry-back to the year 1945, it becomes necessary to determine whether amounts received by petitioner in 1947 as payments under a so-called amended lease of mine lands represent capital gain or ordinary income, in order that the amount of net operating loss available for carry-back may be determined.

As of January 1, 1946, petitioner, by succession in interest, was a party to a mining lease dated October 2, 1899. This lease, by its terms, was to run for a period of 50 years and 3 months, or until January 1, 1950, and provided for certain production and advance or minimum royalties.

The 1899 lease was considered in the case of *Estelle Burt DeVelin et al., Trustees*, 22 B. T. A. 1400, wherein it was held that the royalty payments were ordinary income and not the proceeds of sale of any part of the land or other capital assets. Royalties paid to petitioner

prior to 1946 were reported by him in his income tax returns as ordinary income.

As of January 1, 1946, petitioner and other successors to the original interests of the lessors under the 1899 lease entered into an "Amended Lease" of the Rust Mine Lands with Oliver Iron Mine Company, the successor in interest of the lessee. This amended lease was to run for a period of 50 years from January 1, 1946, and its stated purpose was "to extend the term of said [1899] mining lease and to make certain other modifications thereof." Petitioner's position is that under the amended lease he, as owner of a $\frac{1}{63}$ interest of the mineral rights appurtenant to the Rust Mine Lands, effected a sale of his pro rata share of 20,000,000 tons of ore in place.

The amended lease, which is included in the record by stipulation, is quite lengthy, containing some 56 separate paragraphs. It need not all be here set out, as we are concerned merely with those sections which determine the nature of the instrument and the character of the payments provided to be made, to wit, whether it is a lease of the lands providing for royalty payments to the lessors who, under its terms, retained an economic interest in the minerals to be mined by the lessee, or whether it is a contract of sale of such minerals in place and the payments provided to be made are merely ones in consideration of such conveyance. The pertinent provisions of the lease are as follows:

1. That the Lessors, in consideration of the sum of one dollar ($1.00) to them paid by the Lessee, the receipt whereof is hereby acknowledged, and in further consideration of the covenants, conditions, and provisions of this lease to be kept and performed by the Lessee, do hereby let, demise and lease unto the Lessee, for the further term of fifty (50) years from and after the first day of January in the year one thousand nine hundred and forty-six, the following described lands and premises in the County of St. Louis and State of Minnesota, hereinafter referred to as the "Rust Mine Lands", to-wit:

\* \* \* \* \* \* \*

4. The Rust Mine Lands are demised to the Lessee for the purpose of exploring for, mining, taking out and shipping therefrom the merchantable iron ore (as well as other minerals as hereinafter provided for) which is or hereafter may be found on, in or under the Rust Mine Lands, with the right to the Lessee to construct all buildings and to make all excavations, openings, ditches, drains, railroads, roads and all other improvements which are or may become necessary or suitable for the mining or removing of the iron ore therefrom and the carrying on of mining operations thereon. The term "merchantable ore" as used in this lease shall be taken to mean such ore as shall be merchantable from time to time as the work of mining progresses.

5. The Lessee hereby covenants and agrees to pay to the Lessors a royalty on all iron ore mined and shipped from the Rust Mine Lands while this lease shall remain in force, as follows:

6. Upon the first twenty million (20,000,000) tons of iron ore mined, and shipped by the Lessee from the Rust Mine Lands the royalty shall be at the rate of fifty (50) cents for each gross ton of 2240 pounds avoirdupois.

\* \* \* \* \* \* \*

9. The Lessee further covenants and agrees that for each year prior to January 1, 1966, it will pay to the Lessors the sum of Five Hundred Thousand Dollars ($500,000.00), payable quarterly on the twenty-fifth days of April, July, October and January in each year, irrespective of the quantity of iron ore actually shipped from the Rust Mine Lands during such year or any quarter thereof, and the total amount so paid, including the final payment on January 25, 1966, shall satisfy the royalty of fifty (50) cents per ton on the first twenty million (20,000,000) tons of ore shipped from the Rust Mine Lands.

10. If, prior to January 1, 1966, less than twenty million (20,000,000) tons of ore shall have been shipped from the Rust Mine Lands, the balance of said twenty million (20,000,000) tons of ore, upon which the royalty shall have been paid as above provided, on or before January 25, 1966, may be shipped, without further payment of royalty thereon, at any time thereafter during the existence of this lease; but the shipment thereof shall not be taken to satisfy or affect in any way the minimum requirements after January 1, 1966, hereinafter provided for.

11. If, prior to January 1, 1966, the Lessee shall ship, as it may, more than twenty million (20,000,000) tons of iron ore from the Rust Mine Lands, the Lessee shall pay to the Lessors, in addition to the quarterly payments to be made as aforesaid, the base royalty on all such ore in excess of the said twenty million (20,000,000) tons shipped during each quarter year, payable on the twenty-fifth day of the month following the end of such quarter; and the excess royalty, if any, thereon, shall be paid on the twenty-fifth day of July of the year following the year in which such ore was shipped.

*     *     *     *     *     *     *

47. Notwithstanding any termination of this lease, including the termination of the right of the Lessee thereafter to mine any ore from the Rust Mine Lands, or to ship therefrom any ore theretofore mined, or to continue in possession of the Rust Mine Lands, any unpaid balance of the total amount of Ten Million Dollars ($10,000,000) payable as royalty on twenty million (20,000,000) tons of ore as aforesaid, shall nevertheless be paid by the Lessee to the Lessors in quarterly installments of One Hundred Twenty-five Thousand Dollars ($125,000.00) each, on the 25th days of April, July, October and January in each year, until said amount is fully paid; and for an adequate consideration such obligation is hereby assumed and agreed to be paid as a continuing corporate obligation of said Lessee.

The principle is well settled that the holder of a royalty interest in natural resources possesses an economic interest in the minerals in place. *Palmer* v. *Bender*, 287 U. S. 551; *Burnet* v. *Harmel*, 287 U. S. 103; *Murphy Oil Co.* v. *Burnet*, 287 U. S. 299. It is also well settled that cash bonus payments or advanced royalties when incident to a royalty interest have the same character as royalty payments made under the contract for mineral extracted. *Burnet* v. *Harmel*, *supra; Bankers' Pocahontas Coal Co.* v. *Burnet*, 287 U. S. 308; *Herring* v. *Commissioner*, 293 U. S. 322. The above cited cases determined definitely that such payments represent ordinary income to the lessor, taxable as such, and not capital gain received from the sale of the mineral in place. *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25.

The contract here in question is designated by the contracting parties as a lease, and the payments to be made under its terms are characterized as royalties. Those payments to be made prior to extraction of the mineral are termed prepaid royalties and the payments to be made extend over the term of the lease and under its terms are measured by production. Both the original 1899 lease and the amended lease of 1946 carry the identical provision that

The Lessee hereby covenants and agrees to pay to the Lessors a royalty on all iron ore mined and shipped from the Rust Mine Lands while this lease shall remain in force, * * *

The petitioner's theory is that by paragraphs 9 and 47 of the amended lease the payments agreed to be made are converted from royalty payments to ones in exchange for a transfer of title to 20,000,000 tons of ore in place. With this we do not agree. Paragraph 9 merely obligates the lessee to pay the lessors $10,000,000 over the first 20-year period of the lease even though the full amount of 20,000,000 tons of ore is not extracted during such period. This is merely a provision for minimum royalties. *Bankers' Pocahontas Coal Co.* v. *Burnet*, *supra*. This is clear if the paragraph in question is construed, as it must be, with the two following paragraphs, 10 and 11, which provide that if less than the 20,000,000 tons shall have been mined and shipped prior to 1966, the balance of such tonnage may be taken without further payment of a royalty, and that any excess over the 20,000,000 tons mined and shipped by the lessee during the lease period shall carry an additional royalty payment at a specified rate.

We think it clear that these prepaid royalties required of the lessee under the contract are identical in character to the advanced royalties or cash bonus payments involved in *Burnet* v. *Harmel*, *supra*, and *Bankers' Pocahontas Coal Co.* v. *Burnet*, *supra*.

Petitioner, in support of his position, asserts that under the contract the lessee has bound itself independently under a "corporate liability" to pay the full amount of $10,000,000 irrespective of the amount of production. On this basis it is argued that the lessor does not here have to look to the actual extraction of the mineral for the recovery of this sum. Similar argument was made and rejected in the cases above cited respecting bonus and advance royalty payments. As was said by the court in *Burnet* v. *Harmel*, *supra*:

the payments made by the lessee are consideration for the right which he acquires to enter upon and use the land for the purpose of exploiting it, as well as for the ownership of the oil and gas; under both the bonus payments are paid and retained, regardless of whether oil or gas is found, and despite the fact that all which is not abstracted will remain the property of the lessor upon termination of the lease.

\*       \*       \*       \*       \*       \*       \*

Bonus and royalties are both consideration for the lease, and are income of the lessor. We cannot say that such payments by the lessee to the lessor, to be retained by him regardless of the production of any oil or gas, are any more to be taxed as capital gains than royalties which are measured by the actual production. * * *

The effect of paragraph 47 merely makes clear the obligation of the lessee to pay the full amount of the minimum royalty provided even if the lease be terminated. The fact that this liability is specifically provided to be a corporate liability of the lessee is, we think, without any special significance. It would be such a liability in any case where the lessee was a corporation unless by some specific provision of the lease or by act of the lessor the corporation would be exempted from the liability assumed to make full payment of the advance royalties agreed upon.

Petitioner bases his contention upon the decision in *Anderson* v. *Helvering*, 310 U. S. 404. It is argued that certain of the language used by the Court in that case is applicable to the situation here shown to exist. The language in question, however, was used with respect to a situation entirely different in character from that here presented. There the Court had a case of an outright sale and conveyance of property for a fixed consideration of money. This property consisted of an aggregate of certain royalty interests, fee interests, and deferred oil payments. There the seller sought depletion allowance upon the purchase price by reason of the fact that it had, under the contract of sale, as security for the payment agreed to be made, retained a lien upon 50 per cent of the proceeds of the production of oil and oil payments and also upon the proceeds of any sale of the properties conveyed in fee. The Court held that the seller of the properties had retained no economic interest measured by production, the amount payable to him not being fixed by production of oil and with the possibility that it be satisfied in full from the proceeds of the sale by the purchaser of the properties conveyed in fee.

We think the case of *Anderson* v. *Helvering*, *supra*, has no application to the question here. That case was decided subsequent to most of the cases which we have heretofore cited as laying down the rules under which the retention of an economic interest is to be determined. It in no sense purports to limit or restrict the meaning or effect of the Court's decisions in those cases, the court having cited them as authority for the conclusion which it reached.

We sustain the respondent in his determination that the amount received by the petitioner as an owner of an interest in Rust Mine Lands and under the amended lease of January 1, 1946, constitutes ordinary income and not capital gain.

*Decision will be entered under Rule 50.*