**Arthur S. BARKER and Alberta C. Barker, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 47, 48, Dockets 24095, 24096.**

United States Court of Appeals Second Circuit.

Argued Oct. 15, 1957.

Decided Dec. 9, 1957.

---

John W. Burke, Jr., New York City (William T. Pullman and John A. Clark, New York City, of counsel), for petitioners.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before MEDINA, HINCKS and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

The case involves deficiencies assessed against petitioners for the years 1946, 1947 and 1948, in the respective amounts of $2497.10, $3158.77 and $2009.84, all based upon the receipt of certain amounts in these years by Mrs. Alberta C. Barker. The husband, Arthur S. Barker, is interested only in the 1948 deficiency and this is solely because a joint return was filed by the husband and the wife for that year.

The question is whether certain payments made to Mrs. Barker pursuant to the terms of a written contract with Steers Sand and Gravel Corporation, dated December 31, 1946, should be taxed as long term capital gains or as ordinary income, as held by the Tax Court, 24 T.C. 1160.

In 1943 Mrs. Barker inherited a tract of land at Northport, Long Island. Steers owned approximately 150 acres adjacent to Mrs. Barker's land on the south and west and had been engaged for many years in extracting and processing sand and gravel from its property. Other sand and gravel operations were being carried on a short distance to the north of the Barker property. The entire area was zoned for residential purposes and the Steers operation constituted a non-conforming use in the village of Northport. Steers wanted the sand and gravel on the Barker property but hesitated to buy the land outright for fear that if it did the village would revoke its license and stop Steers' current non-conforming use. Mrs. Barker realized that the noise and dust from the Steers operation made her property undesirable for residential purposes and tried to sell the fee to Steers for $200,000. Steers thought this price too high. The upshot was a sale of the sand and gravel in place. The property consisted of 33 acres, and Steers estimated it would yield 145,000 cubic yards of sand and gravel per acre.

As neither Mr. nor Mrs. Barker had at any time been in the sand and gravel business or in the real estate business, and as Mrs. Barker had held the property for more than six months prior to December 31, 1946, she claimed the moneys received from Steers represented payments for the sand and gravel and reported them in their entirety in the tax returns as capital gains. She used a cost basis of "none," as she considered the property to have a market value for residential purposes after the removal of the usable sand and gravel at least equal to its value prior to such removal.

The Commissioner interprets the agreement as a lease, claims the payments made from time to time are "royalties," and would have us view the case as in the nature of a mining operation in which minerals and natural

deposits are recognized as wasting assets subject to depletion.

We turn to the agreement. It provides that Mrs. Barker "contracts to sell the sand and gravel and hereby sells same" on her property to Steers in consideration of Steers' promise to pay $10,000 at the time of signing the agreement, six cents per cubic yard for the gravel extracted, but no less than $3,000 quarterly regardless of the amount of material actually taken. The $10,000 original payment was to be applied against any quarterly extractions in excess of 50,000 cubic yards made by Steers and there was an averaging clause which provided that by the time of the termination of the agreement Steers would "not be required to pay for an amount of material averaging more than fifty thousand (50,000) cubic yards for each quarterly period at the rate fixed during the period of the Agreement, unless the total amount of material actually removed exceeds that aggregate." The agreement explicitly stated that Steers was not required to remove any amount of sand or gravel, although the $3,000 minimum quarterly payments would still be due. Steers could terminate the contract, upon notice, whenever in its judgment, exercised in good faith, there remained no sand or gravel of the grade it was extracting, otherwise the agreement was to be in force for 15 years, and the company had an option to extend it for another 10 years.

The agreement is long and carefully drawn. There are numerous provisions relating to various small buildings, to the right of access, to public liability insurance and to the defense of any actions or proceedings taken by the village authorities to terminate any nonconforming use. Elaborate defeasance clauses are included giving the "Owner" and the "Company" the right to terminate the agreement. For example, the "Company" may terminate the agreement "at any time after all of the material of commercial quality and availability, in the judgment of the Company, has been removed * * * after three months' notice"; or upon thirty days' notice after the failure of the "Owner" to pay "all special assessments, mortgages, mortgage interests, taxes, amortization payments on mortgages, or other liabilities on the lands * * * that could be subject to a lien for non-payment"; or upon one year's notice if the "Company" is "prevented from taking material from said lands" by reason of any order of the Board of Zoning Appeals or any other order of any court, or "by reason of any act or default by the Owner." And the "Owner" is given the right to terminate on certain notice if the "Company" fails to perform in certain respects, or defaults in making the specified payments, or "upon the removal of all material desired by the Company."

Of course we must look beyond the mere phraseology of the agreement and determine its substance. Pursuing this course, we find the transaction to be a sale of the sand and gravel in place, and not a lease. The parties intended a present passing of title. The payments are not in any sense royalties; they are in liquidation of Steers' obligation to pay for the sand and gravel, but so arranged as to afford security to Mrs. Barker that Steers would live up to its contract. While Steers was not obligated to remove the material, it was obligated to pay for it in the absence of defeasance and reverter, and it took title to the material in place even if it should elect not to remove it. In other words, we have a contract for the sale of sand and gravel for $190,000 to be paid over a 15-year period. This is nonetheless a sale because Mrs. Barker would be further benefited if Steers did not take any or all of the material to which it was entitled.

Under very similar circumstances the Fifth Circuit has held that the avails of the sale of sand and gravel were capital gains and we agree with the reasons given to support this holding. Crowell Land & Mineral Corp. v. Commissioner, 5 Cir., 242 F.2d 864; see also the dissenting opinion of Judge Murdock, who dissented without opinion in the

**198**

case now under review, Crowell Land & Mineral Corp. v. Commissioner, 25 T.C. 223, 227. Cf. Gowans v. Commissioner, 9 Cir., 246 F.2d 448.

In view of the interpretation we have given to the agreement the cases involving the concept of "retained economic interest," developed in connection with depletion deductions in transactions relating to oil, gas and mineral extraction,[1] are clearly inapplicable. Nor should our conclusion in this case be understood as an indication that we have any views concerning analogous or similar transactions in the field of oil, gas and mineral extraction.

Analysis of the cases relied upon by the Tax Court in this case merely confirms the conclusion that the payments received by Mrs. Barker were long term capital gains. In Otis A. Kittle, 21 T.C. 79, the contract, which concerned the exploitation of the Rust Mine Lands, was by its terms a "lease" and the payments were designated as "royalties." The various provisions relating to the proposed operation made it abundantly plain that the words thus used accurately reflected the intention of the parties and the substance of the transaction entered into by them.

The interpretation by the Tax Court of the agreement in Albritton v. Commissioner, was adopted by the Fifth Circuit in its determination of the petition to review in that case, 248 F.2d 49, 51. But there is no real similarity between that case and the one now before us. The Albritton agreement described the parties as "lessor" and "lessee," it expressly provided for "royalties" and the calculation of these "royalties" depended upon the exploitation of what was in effect a joint venture. It is not without significance, we think, that Judge Cameron, in the course of his opinion

in the Albritton case distinguished the Crowell Land & Mineral Corp. case and stated "that its facts differ widely from those we are dealing with here." The Albritton agreement was a lease; in the present case and in Crowell the agreement was a sale.

Accordingly, the decision below is reversed and the case is remanded to the Tax Court for proceedings not inconsistent with this opinion.

1. Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Commissioner of Internal Revenue ·v. Southwest Expl. Co., ..

350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347; Lambert v. Jefferson Lake Sulphur Co., 5 Cir., 236 F.2d 542; Weirton Ice & Coal Supply Co. v. Commissioner, 4 Cir., 231 F.2d 531; Hamme v. Commissioner, 4 Cir., 209 F.2d 29.