ROBERT M. DANN AND HELEN B. DANN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55959.   Filed May 29, 1958.

*Joseph C. Buck, Esq.*, for the petitioners.
*Clarence P. Brazill, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in petitioners' income taxes in the amounts of $3,047.70 for the year 1951, and $3,799.40 for the year 1952.

Most of the adjustments made by respondent in his notice of deficiency were not contested.

The sole issue for decision is whether sums which petitioners received from a contractor for all of the usable soil from certain tracts of their farmlands, which was used by the contractor as fill dirt in the construction of nearby levees and a relocated railroad right-of-way, constituted proceeds from the sale of capital assets, or ordinary income.

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation, together with the exhibits therein identified and therewith admitted in evidence, is incorporated in these findings by this reference.

Petitioners Robert M. Dann and Helen B. Dann are husband and wife, who reside on a farm near Painted Post, New York. They filed a joint income tax return for each of the years involved with the collector or director of internal revenue at Buffalo, New York.

During each of the years 1951 and 1952 and for more than 20 years prior thereto, Dann had engaged in the business of dairy farming, under the name of Dann's Dairy. The land, used for such purpose, was owned by the petitioners jointly. It had been acquired by them in various parcels, from time to time since the year 1932; and all of the parcels here involved had been held by them for a period of more than 6 months prior to the beginning of the year 1950.

In 1950 the State of New York Department of Public Works began construction of a grade-crossing elimination and relocation of the main line of the Erie Railroad in the vicinity of petitioners' farmlands; and it contracted with the Lane Construction Corporation of Meriden, Connecticut (hereinafter called Lane), to act as general contractor to handle the construction work. In connection with this work, the State of New York appropriated certain portions of peti-

tioners' lands, to provide for the new double-track right-of-way and also for certain levees to protect such right-of-way from the overflow of an adjacent river.

Lane required large amounts of fill dirt with which to build the new right-of-way and levees; and its representatives contacted Dann with a view to procuring such fill dirt from the petitioners' farmlands. Thereupon a verbal arrangement was made, under which petitioners agreed to sell to Lane soil from a certain tract known, after excavation, as Pit No. 1. This tract was approximately 1,750 feet long and approximately 750 feet wide, and it had an area of approximately 30 acres.

At the time of making such arrangement, the parties knew and intended that Lane would remove from the tract for its fill dirt needs, all of the soil from the surface down to the top of the water table. They knew the precise surface area to be excavated; but they could not determine in advance the precise number of cubic yards of soil to be removed, because the depth of the water table below the surface varied from about 30 feet to zero, owing to the rolling contour of the land, and it was not practicable for Lane to excavate under water. The material to be removed did not have any particular mineral content; it was simply earth or dirt, containing some loam, sand, clay, and gravel.

After Lane had moved onto the property to begin excavation, a one-page written agreement relating to the tract was prepared in Lane's office, and was there executed by the parties under date of May 17, 1950. Such written agreement described the perimeter of the tract to be excavated by metes and bounds; and it granted Lane the right to enter upon the tract and to remove the soil (in the agreement referred to as "material") for use in its construction work. The agreement also provided that Lane would pay for the soil removed at the rate of 5 cents per cubic yard; that the quantity of the removed soil would be measured by engineers employed by the State Highway Department; and that the measurements determined by them would be final and binding on all parties. Among several miscellaneous provisions contained in the last paragraph of the agreement was one requiring Lane to leave the bottom of the pit reasonably smooth, in order to care for drainage and to prevent the formation of pools of water; and another provision required Lane to slope the back edge of the pit in a prescribed manner, so as to prevent cave-in of the adjacent property. Dann insisted on the first of these miscellaneous provisions because of his desire to prevent the creation of possible attractive nuisances in the form of pools of water where neighborhood children might come to swim, with the concomitant danger of their drowning.

Thereafter, in July 1950, Lane and petitioners executed a second of these printed agreements pursuant to similar arrangements, relating

to a second tract which was therein described by metes and bounds, which had dimensions of 650 by 750 feet, and which contained approximately 11 acres. This tract, after excavation, was known as Pit No. 2. This second agreement likewise provided for measurement of the quantity of soil removed, by State engineers; and, by its terms, Lane was to pay for the soil so determined to have been removed at the rate of 12½ cents per cubic yard. The agreement, like the preceding one, also included miscellaneous so-called "special provisions" which required Lane to leave the bottom of the pit smooth and draining in a specified direction, and which also required it to leave the back edge of the pit sloped in a specified manner.

Lane, finding that the soil to be excavated from Pits No. 1 and 2 would be insufficient for its needs, caused its representatives to again approach Dann with a view to purchasing additional soil. Among the tracts then owned by Dann and his wife was one of approximately 40 acres lying adjacent to the river. The State of New York had theretofore appropriated a strip of this tract, running east and west, for use as the relocated right-of-way, and also a strip running from south to north along the eastern edge of the tract for construction thereon of one of the above-mentioned protecting levees. Petitioners orally contracted to sell to Lane the usable soil from this parcel, lying south of the right-of-way and between it and the river; but before excavation thereof was begun, the State authorities refused to grant permission for this to be done, unless Lane would agree to "rip rap" the embankment of the relocated right-of-way with concrete, for protection from the river. Lane did not wish to meet this requirement, and accordingly no soil was removed from this parcel, pursuant to said oral contract.

Lane's representatives then sought to purchase from petitioners usable soil from another parcel owned by them, lying to the north of the relocated right-of-way, between it and the old right-of-way. Petitioners reluctantly agreed to sell the soil from this parcel, designated after excavation as Pit No. 3. Thereafter in August 1950, a third printed-form agreement was executed by petitioners and Lane under arrangements similar to those previously made, wherein the perimeter of the tract, comprising approximately 12 acres, was described by metes and bounds. Such agreement, as did the other two, also provided that the State engineers would measure the soil removed; and it fixed the price per cubic yard of soil so determined to have been removed, at 17½ cents per cubic yard. Among the "special provisions" inserted in this agreement, as in the others, was one requiring that the slopes of the pit edge be left smooth, and requiring that the entire area be graded so as to drain into a culvert under the relocated right-of-way.

Lane, as contemplated, removed all of the usable soil from each of the pits here involved; and, since this proved to be insufficient for its needs, it sought to acquire still more from petitioners. The latter, however, were unwilling to sell any more soil from their farmlands; and, as a consequence, Lane sought and obtained other fill dirt from lands of petitioners' neighbors, in order to complete its construction work on the levees and the relocated right-of-way.

After completion of excavating operations by Lane in each of the pits, the acreage therein was rendered entirely unfit for use in Dann's dairy farming business. The bottoms of the pits were covered with rocks and weeds, and during a portion of each year were covered with water. Nor was it possible to rehabilitate the land in the pits so as to render it usable by them. Petitioners purchased new tracts of farmland, to replace those excavated, for use in the dairy-farming business.

Petitioners were not dealers engaged in the sale of soil. Except pursuant to the three agreements hereinabove described, they never sold or removed for sale any soil from their farmlands.

As provided in the agreements, State engineers measured the amounts of soil removed from Pits No. 1, 2, and 3; and, after the excavation of each pit was completed, Lane paid petitioners for the soil removed therefrom, at the unit prices provided in said agreements.

In the year 1951, petitioners received from Lane, in payment for the soil so removed, the sum of $20,585; and in the year 1952, they received $10,708.13. They reported their gains therefrom as long-term capital gains from the sale of capital assets, using as the cost of such assets certain amounts which the respondent, in his notice of deficiency, specified but did not dispute.

In determining the deficiencies herein, respondent treated the amounts which petitioners received from Lane, as aforesaid, as ordinary income; and he allowed a deduction therefrom of 5 per cent of said amounts, as percentage depletion in respect of sand, gravel, and stone under sections 23 (m) and 114 (b) (4) (A) (i) of the 1939 Code.

After execution of the above-described agreements between Lane and petitioners, the latter retained no economic interest in the usable soil contained in the tracts of land therein described. The parties intended to, and did, effect completed sales of all the usable soil in place, within specified areas and at specified cubic yard prices.

OPINION.

Facts stipulated by the parties make it clear that petitioners were not in the business of selling soil; and also make it clear that the soil

involved was not held by the petitioners for sale to customers in the ordinary course of any trade or business. Also, we have found as a fact that the 6 months' holding period has been satisfied in the case of each tract here involved. Furthermore, no dispute exists as to the correctness of the amounts received by petitioners with respect to the soil; and the cost basis allocated thereto has not been questioned by the respondent. Accordingly, the sole and narrow question for decision is whether, as petitioners contend, they made sales of the soil in place, so as to entitle them to treat their gains from the amounts received, as long-term capital gains under the provisions of section 117, I. R. C. 1939; or whether, as respondent contends, they made leases of the tracts, which caused the amounts received by them to be treated as ordinary income in the form of "royalties," after allowance for percentage depletion.

Respondent argues that the agreements were leases which did not, of themselves, convey title to anything, but merely granted Lane the right to enter upon the premises and mine and remove soil, subject to the payment of a stipulated royalty for each cubic yard removed. He likens the agreements to mineral leases of the type involved in *Burnet* v. *Harmel*, 287 U. S. 103. He further argues that petitioners retained an economic interest in the soil involved.

We, however, sustain petitioners' contention, and hold that they made completed sales of all the usable soil in place, within specified areas and at specified cubic yard prices; and that petitioners' gains from such sales are taxable as long-term capital gains.

The short written agreements executed by the parties are not, in themselves, sufficiently detailed and complete to reveal the true nature of the transactions involved. It is to be observed, however, that such agreements do not employ any such terms as "lease," "lessor," "lessee," or "royalties"; but, rather, they describe by metes and bounds certain areas from which the usable soil was to be removed; and they further specify the condition in which the walls and floors of such areas were to be left, after the soil had been removed. It is necessary, in such circumstance, to look beyond the mere phraseology of the summary written agreements, and to determine the true substance of the transactions, from all the facts and surrounding circumstances. *Barker* v. *Commissioner*, (C. A. 2) 250 F. 2d 195, reversing 24 T. C. 1160. See also *Palmer* v. *Bender*, 287 U. S. 551. As was stated by the Court of Appeals for the Fifth Circuit in *Crowell Land & Mineral Corporation* v. *Commissioner*, 242 F. 2d 864, reversing 25 T. C. 223, "Looking to the actual circumstances as well as the language of the contract of sale, there is no occasion or basis for resorting to legal niceties of interpretation to defeat the basic purpose and effect of the transaction."

Here, we find that the contractor, the Lane Construction Corporation, required large amounts of fill dirt for construction of an embankment for a relocated double-track right-of-way of the main line of the Erie Railroad, and also for the construction of protecting levees. The contractor's representatives thereupon approached petitioner Robert Dann, a dairy farmer who with his wife owned considerable land in the vicinity of the construction projects, looking to the purchase of soil from certain of their lands. Petitioners agreed to sell the soil from various of their tracts; and all parties intended, and knew at that time, that Lane would remove *all* the usable soil in the tracts, from the surface down to the top of the water table, beyond which point it was impracticable for Lane to excavate. Petitioners also were aware that the tracts, after removal of such soil, would no longer be usable for dairy farming operations. The above-mentioned agreements were thereupon executed; and in these agreements, the boundaries of the tracts were spelled out by metes and bounds, and specific provisions were inserted concerning the condition in which the perimeters of the tracts would be left by Lane after completion of the excavation—thus further indicating to us that the parties contemplated that Lane would take *all* the usable soil therefrom. Payment for the soil to be removed was set at fixed and certain amounts per cubic yard; and the quantities so removed were to be measured and determined by neutral and disinterested third parties, the State-employed engineers, whose determinations were to be binding upon all the parties. After the excavation work had been completed and the amounts of soil removed had been so fixed, Lane paid petitioners therefor. Lane did in fact remove all the usable soil from the three tracts involved. Thereafter, it sought additional soil from other tracts of petitioners; and, when they refused to sell any more, Lane obtained additional fill dirt from other landowners in the vicinity.

From the foregoing and the entire record, it is our opinion that the parties really intended to, and did, make completed purchases and sales of all the usable soil in place, in the three tracts here involved.

It further should be observed that the material removed from the tracts was merely earth or dirt, and not any particular type of mineral deposit, although it was composed in part of sand and gravel. The parties were not looking to the exploitation of any mineral or gravel deposit, under which Lane would remove and market such deposit, and under which petitioners would share in the production or proceeds therefrom. Rather, Lane was in the position of needing fill dirt for immediate use in its nearby construction projects; petitioners had the required material which they were willing to sell; and the substance of what actually was done was that petitioners made completed sales to Lane of the soil in place.

Moreover, the arrangements between the parties were not the usual type of mineral leases; and, in view of the interpretation we have given the arrangements and agreements, cases involving the concept of "retained economic interest," developed in connection with depletion deductions relating to oil, gas, and mineral extraction, are clearly inapplicable. *Barker* v. *Commissioner, supra; Crowell Land & Mineral Corporation* v. *Commissioner, supra.* The Supreme Court pointed out in *Commissioner* v. *Southwest Exploration Co.,* 350 U. S. 308, that for a taxpayer to have a retained economic interest in a natural deposit to be removed, (1) he must have acquired, by investment, an interest in such deposit, and (2) he must have secured, by some legal relationship, income from the extraction of such deposit, to which he must look for a return of his capital. And the Supreme Court further pointed out in said case, that the taxpayer "must look *solely* to the extraction * * * for a return of his capital."

Applying said principles to the instant case, we think that, while the first of the above-mentioned requirements is present, the second requirement has not here been met. Here, all the usable soil in each specified area was sold at a fixed unit price; and there was no contingency which would vary either that price, or Lane's obligation to pay it. Although no time limit was fixed in the agreement for the removal of the soil, the immediate use to which it was to be put by Lane made it clear and necessitated that the removal was to be expeditious. Also, petitioners were not entitled to receive or be credited with any part of the material removed, nor were they to share in any income or profit which Lane might derive from the removal of the material. See *Crowell Land & Mineral Corporation* v. *Commissioner,* (C. A. 5) *supra.* Rather, the sums which petitioners were to receive did not depend in any way on what Lane could earn from the removal or from its use of the material as fill dirt. Such removed material belonged to Lane alone; and petitioners looked for recovery of their capital solely to their contractual rights against Lane. Thus, in our opinion, petitioners did not retain any economic interest in the material involved.

Finally, after the soil had been removed, the excavated tracts were entirely useless to petitioners in the dairy-farming business, as had been anticipated. During the dry portion of each year, these tracts remained barren pits, strewn with rocks and covered with weeds; and, during other portions of the year, they were submerged under water. It was not possible to rehabilitate them; and petitioners were forced to acquire new tracts to replace those excavated, for use in the dairy-farming business.

The instant case is distinguishable on its facts from other cases decided by this Court, relating to the exploitation of sand and gravel deposits: *William Louis Albritton,* 24 T. C. 903, affd. (C. A. 5) 248

F. 2d 49; *Arthur S. Barker*, 24 T. C. 1160, revd. (C. A. 2) 250 F. 2d 195; and *Crowell Land & Mineral Corporation*, 25 T. C. 223, revd. (C. A. 5) 242 F. 2d 864. In the *Albritton* case, the instrument was in all respects a mining lease. It was, by its terms, designated as a "lease"; the taxpayers were designated as "lessors"; and the amounts to be paid for any sand and gravel "mined and shipped" from the leased premises were designated as "royalties." The amounts of such royalties were based on specified percentages of the "retail sales value" and of the "retail price" for the sand and gravel "so mined and shipped." Also, the instrument required prompt and continuing exploitation by the "lessee"; and provided for termination of the "lease" upon a 6 months' suspension of operations by the lessee.

In the *Barker* case, the agreement was for a specified term of years; and it was terminable by the contractor if, among other reasons, it was prevented from extracting materials by reason of zoning ordinances, or if the taxpayer-landowner failed to meet obligations which could become a lien against the land. Also the landowner was granted the right to terminate, if the contractor failed to leave safe slopes, or if it defaulted in payments, or after it had removed all the material desired. The agreement further provided specifically, that the contractor was not obligated to remove *any* sand and gravel. In addition, the lands there involved had as high a fair market value for building purposes, after the sand and gravel had been removed, as they had before such removal. All of this is different from the instant case, wherein there were no termination provisions; where the intention of the parties was that all usable soil in specifically designated areas would be removed; where specific unit prices were fixed for all the soil in the designated areas; and where the property left after excavation had no substantial value.

In the *Crowell* case, the instrument involved gave a corporation the right to go upon the taxpayer's property and remove sand and gravel within a 5-year period, after which such right would terminate; and the corporation was to pay for any material removed, as the extraction proceeded. This Court concluded that such factors were "typical indicia of the existence of an economic interest" retained by the taxpayer, and that such taxpayer was not entitled to capital gains treatment. Nevertheless, the Court of Appeals for the Fifth Circuit held upon its review of the case, as did the Court of Appeals for the Second Circuit in the *Barker* case, that there was in substance a completed sale of the sand and gravel in place.

On the basis of all the foregoing, we decide the issue here presented in favor of the petitioners.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

OPPER, *J.*, dissenting:

*I.*

The written contracts between the parties are not set forth in the findings. I find it impossible to make any analysis of the present problem without them. They are sufficiently similar so that the operative portion of a single agreement will suffice:

WHEREAS, the party of the second part is the sole and rightful owner of a certain parcel of land located in * * *

AND WHEREAS, the above described property contains certain materials considered suitable for road building purposes.

NOW THEREFORE, for the consideration hereinafter stated, the said party of the second part grants permission to the party of the first part to enter upon the above described property and to remove therefrom material to be used in the construction of said Highway.

For the material removed, party of the first part agrees to pay party of the second part the sum of Five cents (05¢) per cubic yard.

The quantity of material removed shall be determined by Engineers of the New York State Highway Dept. of Public Works and their measurements and quantities shall be accepted as correct and final by both parties to this agreement.

Party of the second part agrees to provide free right-of-way to the party of the first part to and from above described property to Bear town Road.

On all of the facts, including the contracts, this proceeding is indistinguishable from *Crowell Land & Mineral Corporation*, 25 T. C. 223, revd. (C. A. 5) 242 F. 2d 864, and *Arthur S. Barker*, 24 T. C. 1160, revd. (C. A. 2) 250 F. 2d 195, except as it may be more favorable to respondent. Although disclaiming any intention to do so, the appellate courts in their reversals laid strong emphasis on the language of the agreements, referring to the parties as vendor and vendee, and to the transaction itself as a sale. Nothing like that is possible here.

In no respect is this case stronger for the taxpayer. Here, as in the *Crowell* and *Barker* cases, the price was fixed at a rate per unit removed. No requirement existed that a specified quantity be taken or that a time limit be set. Here, as in both of the other cases, title would pass only on severance and material not ultimately removed would remain the property of the owner of the land. And the fact that the land would supposedly not be usable upon completion of the operation does not distinguish it from the *Crowell* case, where the court said (p. 867) : "It [the material] was all removed and the area covered with water, rendering it useless."

It seems to me inescapable that those decisions in the Tax Court should either be followed or overruled.

## II.

It may with deference be suggested that the conclusions on appeal in *Crowell* and *Barker* were erroneous. Cf. *William Louis Albritton*, 24 T. C. 903, aff'd. (C. A. 5) 248 F. 2d 49; *Otis A. Kittle*, 21 T. C. 79, affirmed per curiam (C. A. 9) 229 F. 2d 313.

Ever since such early cases as *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503, comparable arrangements have been construed as mineral leases and the proceeds as taxable accordingly. The payments "are 'the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows.' Lord Dennison, in *Queen* v. *Westbrook*, 10 Q. B. 178, 205." *Von Baumbach* v. *Sargent Land Co.*, *supra* at 518. The same case (p. 517) refers to—

the rule established by the great weight of authority that such leases do not constitute a sale of any part of the land, and, further, that iron or other materials derived from the usual operation of open mines or quarries, constitute the rents and profits of the land, and belong to the tenant for life or years, and to the mortgagor after sale on foreclosure, * * *

In that and similar cases—

[i]t was argued that since the net result of the mining operation is a conversion of capital investment as upon a sale, the money received by the * * * lessor, being its capital in a changed form, could not rightly be deemed to be income. But that argument was rejected, * * * with respect to payments made by the lessee to the corporate lessor under the provisions of a mining lease. *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503, 521, 522; *United States* v. *Biwabik Mining Co.*, 247 U. S. 116.

Although these cases arose under the Act of 1909, before the enactment of the capital gains provision in the 1921 Act, they established, for purposes of defining "income" in a tax measured by it, that payments by lessees to lessors under mining leases were not a conversion of capital, as upon a sale of capital assets, but were income to the lessor, like payments of rent. * * * [*Burnet* v. *Harmel*, 287 U. S. 103, 107, 108.]

In *Crowell Land & Mineral Corporation*, *supra* (p. 225), we said:

It is idle to suggest that these transactions do not somewhat resemble sales, just as a lease of real property has aspects of the day-by-day conveyance of the property to the tenant. As each cubic yard of sand or each ton of coal or metal ore is removed and the owner is paid for that much of the mineral, the transfer is indeed in many ways comparable to the sale of a capital asset. This is so whether the arrangement calls for so much a yard or a ton, *Bankers' Pocahontas Coal Co.* v. *Burnet*, 287 U. S. 308, *Otis A. Kittle*, 21 T. C. 79, or a varying amount depending upon retail price, *William Louis Albritton*, 24 T. C. 903, net profit, *Burton-Sutton Oil Co.* v. *Commissioner*, *supra*, or the like. The continuous deterioration of other property compensated for by depreciation has also been likened to a series of fractional sales. *United States* v. *Ludey*, 274 U. S. 295. That detail of income tax accounting has not sufficed to transform an item accountable for as ordinary income into capital gain.

The recovery of capital by depletion in the case of minerals is comparable to the process of deducting for depreciation. *United States* v. *Ludey, supra; Choate* v. *Commissioner,* 324 U. S. 1. And by the same token when, under a mineral lease, the property is removed bit by bit and the consideration for it is paid over a number of years, the impelling reason for conferring upon a taxpayer the benefit of capital gains treatment tends to disappear. He does not receive in one year, subject to high surtax rates, the proceeds of an asset which may actually represent the accumulation of increments in value over a long period. See H. Rept. No. 350, 67th Cong., 1st Sess. (1921), p. 10; S. Rept. No. 275, 67th Cong., 1st Sess. (1921), p. 12. * * *

In *Otis A. Kittle, supra,* which involved iron ore, we said (pp. 88, 89):

As was said by the court in *Burnet* v. *Harmel, supra:* "the payments made by the lessee are consideration for the right which he acquires to enter upon and use the land for the purpose of exploiting it, as well as for the ownership of the oil and gas; * * *"

### III.

It may well be, however, that a better course would have been to bow to the reversals in the *Crowell* and *Barker* cases and withdraw from the position taken here in those decisions, if we would only say so. To state at this time that we are unable to distinguish the *Crowell* and *Barker* cases, but that because of the reversals the Tax Court decisions will no longer be followed, would be a respectable position.

Some of the less obvious infirmities of *Arthur L. Lawrence,* 27 T. C. 713, are perhaps illustrated here. Cf. 8 J. of Taxation 228 (1958); 7. J. of Taxation 172 (1957); 9 Stanford L. Rev. 827 (1957); 7 Duke L. J. 45 (1957); 70 Harv. L. Rev. 1313 (1957); 57 Col. L. Rev. 717 (1957); 43 A. B. A. J. 945 (1957). This proceeding would go on appeal to the same circuit that reversed the *Barker* case. There are not adequate distinctions from that case to make it likely that an opposite result here would be affirmed. But we have said that we would not overturn a prior decision merely because a reversing circuit will again be the forum for appeal. *Arthur L. Lawrence, supra.* And so, rather than accept the fact that our own precedents are vulnerable, we grasp the shadow of a totally untenable attempt to establish a distinction.

It seems to me that, if we are going to follow the reversing circuit, we should say so; and more important, that the integrity of the judicial process requires that taxpayers and the tax bar be rescued from such bewildering uncertainty as must now continue to exist in this area.