Nathaniel Clark Wood and Estate of Gertrude L. Wood, Deceased, Nathaniel Clark Wood, Executor v. Commissioner.
Wood v. Commissioner
Docket Nos. 6629-65, 2515-67.
United States Tax Court
T.C. Memo 1968-178; 1968 Tax Ct. Memo LEXIS 121; 27 T.C.M. (CCH) 871; T.C.M. (RIA) 68178; 30 Oil & Gas Rep. 493; August 12, 1968. Filed Clarence P. Brazill, Jr., 1900 Great Plains Life Bldg., Lubbock, Tex., for petitioners. John W. Dierker, for respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in the income taxes of petitioners for 1962, 1963, 1964 and 1965 in the following amounts: Year
Amount
1962
$26,000.06
1963
$23,550.70
1964
$56,043.62
1965
$44,120.15
After various concessions by the *122 parties, the sole issue remaining is whether amounts received by petitioners in 1963, 1964 and 1965 under an agreement entitled "Contract For Sale of Sand, Gravel, and Rock" are entitled to capital gain treatment as reported or constitute ordinary income as determined by respondent. Findings of Fact Some of the facts have been stipulated and are found accordingly. Nathaniel Clark Wood is the duly qualified Executor of the Estate of Gertrude L. Wood, deceased. Gertrude L. Wood died March 16, 1967. Nathaniel Clark Wood (hereinafter referred to as petitioner) filed the petitions on his own behalf and on behalf of the Estate of Gertrude L. Wood. [1] Petitioner resided in Crosby County, Texas, at the time the petitions were filed. Petitioner and his deceased wife filed joint income tax returns for the taxable years 1962, 1963, 1964 and 1965 with the district director of internal revenue in Dallas, Texas. In 1950, petitioner acquired 14,088 *123 acres of land in Crosby County, Texas. During the years 1962 through 1965, petitioner was engaged in the business of ranching on this land. On November 22, 1954, petitioner entered into an agreement (1954 agreement) with Noble W. Prentice and his associates (hereinafter Prentice), entitled "Sand, Gravel and Rock Lease," calling for removal of sand and gravel from petitioner's property. In Wood v. United States, 377 F. 2d 300 (C.A. 5, 1967), certiorari denied 389 U.S. 977 (1967), the Court of Appeals for the Fifth Circuit held that payments under the 1954 agreement for sand, gravel and rock constituted ordinary income to petitioner. [2] The parties have stipulated that payments received by petitioner in 1962, under the 1954 agreement, are governed by that decision.
Following conferences with the Internal Revenue Service beginning in 1960, relating to petitioner's claim for capital gain treatment of his receipts under the 1954 agreement, petitioner, Prentice, and Janes-Prentice, Inc., assignee of the 1954 agreement, executed *124 two agreements dated May 21, 1963. The first of these agreements was entitled "Cancellation and Release of Contract." After reciting the history of the 1954 agreement and stating that the intention of the parties in executing the 1954 agreement was to transfer all of petitioner's interest in the sand, gravel and rock in place to Prentice, this agreement provided that each of the parties mutually released the others from all rights and liabilities under the 1954 agreement. 872 The second agreement of May 21, 1963 (1963 agreement), which is the subject of this controversy, was entitled "Contract For Sale of Sand, Gravel, and Rock" and provided, in pertinent part, as follows: Vendors, for and in consideration of the sum of TEN DOLLARS ($10.00), the receipt of which is hereby acknowledged, and for the further consideration as hereinafter stated, do by these presents grant, bargain, sell, convey, set over, assign, and deliver unto the Vendees all the sand, gravel, and rock from those certain tracts of land more particularly described as follows: * * * (1) It is intended that the Vendees will remove all the commercially saleable sand, gravel, and rock from the subject premises, *125 and the total purchase price to be paid therefore shall be based on the quantity of such sand, gravel, and rock removed. As the quantity of such sand, gravel, and rock in place is unknown and is not subject to accurate measurement or determination, the purchase price and the quantity of sand, gravel, and rock removed shall be measured as follows: (a) Vendees shall pay to Vendors twentyfive cents (25") on each and every cubic yard of sand, gravel, and rock removed from the subject premises. (b) The quantity of sand, gravel, and rock removed shall be calculated on truck measurements at destination; or if shipped by railroad, railroad weights to govern and yardage shall be calculated on the basis of 2,800 pounds per cubic yard. (c) "Commercially saleable" sand, gravel, and rock is defined to mean such sand, gravel, and rock as Vendee may reasonably sell and realize a profit therefrom. When profitable operation is not possible, in the judgment of Vendees, this contract may be terminated upon notice by Vendees without recourse by either party hereto. (2) The Vendees shall remove at least 60,000 yards of sand, gravel, and rock per year. In the event that less than 60,000 yards are *126 removed in any year, the Vendees shall make an additional payment measured by the difference between the yards of sand, gravel, and rock removed and 60,000 yards, in order that the minimum payment to Vendors in any year shall not be less than $15,000.00. Such additional payment shall be recouped by Vendees in the subsequent year, or years, out of payments which would otherwise have been made to Vendors for sand, gravel, and rock removed in excess of 60,000 yards in any one year. In the event of a national emergency or calamity, such as severe depression where sales are reduced, or war, during which time production and sale of construction materials are controlled, or greatly reduced and it is not possible for Vendees to sell materials profitably or in quantities sufficient to meet the minimum purchase guarantee, Vendees may give Vendors written notice of ninety days (90 days) that Vendees cannot continue to comply with the minimum purchase guarantee and be relieved from the running of said minimum under this contract for the duration of said emergency or calamity period. (3) This contract of sale and rights granted herein shall endure and run from the first day of January, 1963, *127 and thereafter according to the terms of Paragraph (4), and Vendees shall be given a reasonable time after notice to perform any of the actual or implied covenants, conditions, or stipulations during the term of this contract. (4) This contract shall terminate when all the commercially saleable sand, gravel, and rock has been removed, or upon default. Upon termination of this contract by default, the Vendees shall reconvey all of the remaining sand, gravel, and rock still in place in the ground to Vendors, except all processed and stockpiled materials shall remain the property of Vendees, and upon removal from the premises Vendees shall pay the agreed purchase price therefore and Vendees reserve the right of ingress and egress for the removal of said processed materials. (5) Vendees by these presents obligate themselves to keep a full, true, and accurate record of all sand, gravel, and rock mined and removed from the said premises, and agree that said Vendors shall have free access to such records during all business hours, and based upon such records said Vendees are obligated to mail to Vendor Clark Wood before the 15th day of each month at Slaton, Texas, a statement showing *128 the quantity of material removed from premises during the preceding calendar month, which statement shall be accompanied by the amount due as hereinabove provided. (6) Vendors agree to protect the Vendees in the peaceful possession of the subject premises described on Pages 1 and 2 for the purpose of mining, processing, and removing sand, gravel, and rock for so long as this contract is in effect. (7) Vendees may place upon said premises any and all machinery, equipment, structures, roads, railroad, and such other things which may be necessary or convenient for use in mining, processing, loading, and transporting sand, gravel, 873 and rock and for such other operations as may be incident to the drilling, exploration, mining, processing, and removing of such materials. Vendees after the termination of this contract, for whatsoever cause, are hereby expressly granted a reasonable time within which to remove such property and objects so placed upon said premises by it, not to exceed ninety (90) days, and agree to give peaceable possession at the end of that time. Any and all such property and objects placed upon the premises shall remain personalty and shall never be considered *129 part of the realty as by attachment to the soil. (8) Vendees may build dams to impound water necessary to the proper washing of sand and gravel, or drill water wells, or excavate existing springs (with the permission of Vendors Clark Wood and wife, Gertrude Wood, only, as to existing springs), or seepage water, or dig pits in the river bottom or adjacenit thereto to secure water, and lay all necessary water lines, construct power lines for pumping or plant operation and do all other things reasonable and necessary on the land to secure efficient and economical production. (9) Vendees agree to save whole and hold harmless Vendors from any liability which may result from the acts or omissions of Vendees, their employees or agents, resulting from anything Vendees may do on the subject premises or as a result of this contract of sale. (10) Vendees agree to build and maintain and keep cleaned out cattleguards at any point where it is necessary roads cross fence lines. Where Vendors need roads across Vendees' roads, then Vendees will keep barrow ditches at said crossing filled up to road crossing level so Vendors may cross in any motor vehicle. (11) Vendees agree to consult with *130 Vendors before changing pit locations or move plant location or do other things which might withdraw or destroy more land for Vendors' use and enjoyment. (12) Vendees agree to operate upon said premises in an orderly and workmanlike manner, and shall disturb Vendors and their tenants as little as reasonably possible in their normal use of said land for farming and grazing. (13) Nothing in this contract shall be construed as an oil and gas lease, and Vendors expressly retain the right to lease said premises, or any part thereof, for oil and gas, but it is expressly agreed and understood that the rights created in any lessee in such oil and gas lease shall be subject to all the rights and privileges created in Vendees herein under the terms of this contract. (14) This contract of sale and all its terms, conditions, and stipulations shall extend to and be binding on all successors, heirs, and assigns of said Vendors or Vendees. Vendees must secure written agreement of Vendors before any sale or assignment or encumbrance of the sand, gravel, and rock in place is consummated, but it is specifically agreed that this reservation is made to the present Vendors only, and that in the event *131 the present Vendors, Clark Wood and wife, Gertrude L. Wood, sell the ranch the Vendees may sell or assign or encumber all their rights, title, or interest under this contract subject to its terms. Failure of Vendees to secure the written agreement of Vendors before selling, assigning, or encumbering the sand, gravel, and rock in place shall terminate this contract and Vendees shall be obligated to execute a reconveyance of all remaining sand, gravel, and rock to Vendors. (15) Nothing in this contract shall be construed as a retention by Vendors of an economic interest in the sand, gravel, and rock in place. [3]
No interruption of Janes-Prentice's sand and gravel extraction and processing business occurred between the termination of the 1954 agreement and the execution of the 1963 agreement. Petitioner received $102,167.04 in 1962 under the 1954 agreement and $103,284.71, $125,880.15 and $113,560.34 in the years 1963, 1964 and 1965, respectively, under the 1963 agreement, for removal of sand, gravel and rock from his property. *132 Petitioner carries on cattle ranching activities on his property. He has built fences to separate the sand and gravel pits and processing plant from his ranching activities. When the sand and gravel have been removed from a pit, the area covered by the pit is no longer useful for ranching activities because grass and other vegetation will not grow on it. Ultimate Finding of Fact Petitioner retained an economic interest in the sand, gravel and rock, in place, under the 1963 agreement. Opinion On November 22, 1954, petitioner entered into an agreement with Prentice calling for the exploitation of the sand, gravel and rock on petitioner's 14,088-acre ranch. The 874 1954 agreement was cast in terms of a "lease" and provided for a "royalty" of 25 cents per cubic yard of sand, gravel and rock removed, with a minimum royalty of $15,000 per year. Petitioner treated sums received under the 1954 agreement as ordinary income in his tax returns for the years 1958, 1959 and 1960. Later he claimed capital gain treatment of his receipts in a refund suit which culminated in an exhaustive analysis of the authorities in an opinion by Judge Thornberry for the Court of Appeals, holding *133 that petitioner's receipts were ordinary income. Wood v. United States, 377 F. 2d 300 (C.A. 5, 1967), certiorari denied 389 U.S. 977 (1967). While the tax refund controversy was pending, petitioner, on May 21, 1963, entered into two new agreements with JanesPrentice, assignee under the 1954 agreement, whereby the 1954 agreement was canceled and a new agreement entitled "Contract For Sale of Sand, Gravel, and Rock" was executed. The 1963 agreement contained the substance of most of the provisions (though rearranged in order) which appeared in the 1954 agreement except that the new agreement was cast in the form of a purchase and sale and the parties were referred to as "Vendors" and "Vendees." Although described as the "purchase price" rather than a "royalty," the provisions for payments under the 1963 agreement as the sand and gravel were removed (25 cents per cubic yard) and the minimum royalty ($15,000 per year) remained substantially unchanged. [4] However, language was added to the 1963 agreement calling for a reconveyance of the sand and gravel to petitioner upon termination of the agreement by default, and expressly disclaiming the retention of any *134 economic interest in petitioner. *135 We are thus faced with the question of whether the changes made by the 1963 agreement are sufficient to convert the arrangement into a "sale" of the sand, gravel and rock in place entitling petitioner to treat the amounts received thereunder in 1963, 1964 and 1965 as gain from the sale of a capital asset under 1954 Code section 1221. [5]
Both parties agree that our decision must turn on whether petitioner retained an economic interest in the sand and gravel in place. In Palmer v. Bender, 287 U.S. 551 (1933), the Supreme Court first enunciated the economic interest concept and laid down a test for determining whether a taxpayer has an economic interest in a mineral deposit. The Court held that a taxpayer has an economic interest where he has (1) acquired by investment any interest in the mineral in place, and (2) secured, by any form of legal relationship, income derived from the extraction *136 of the mineral to which he must look for a return of his capital. Sec. 1.611-1 (b), Income Tax Regs. This test, however, possesses a delusive simplicity. A host of decided cases show that it is easy to state but frequently difficult to apply, a careful analysis of the entire arrangement being required in each case. Petitioner concedes that he meets the first requirement of the two-pronged test, i.e., that he acquired an interest in the sand and gravel in place by investment. He 875 contends, however, that under the terms of the 1963 agreement he disposed of his interest by sale, even if the Court of Appeals was correct in holding the 1954 agreement to be a lease. He contends that his income was not derived from the removal of the sand and gravel but was only measured by the amount removed. After careful consideration, we have concluded that the changes made by the 1963 agreement are fundamentally only formal in nature, and under that agreement petitioner could look only to the removal of the sand and gravel for the recovery of his capital investment therein. In our opinion, the agreement did not effect a sale of the sand and gravel in place; to the *137 contrary, petitioner parted with the material only as it was removed. The more recent, and we believe, the better reasoned opinions on this recurring problem support our conclusion. See, e.g., Hair v. Commissioner, 396 F. 2d 6 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court; Alkire v. Riddell, 397 F. 2d 779 (C.A. 9, 1968); Schreiber v. United States, 382 F. 2d 553 (C.A. 7, 1967); Wood v. United States, supra; Rabiner v. Bacon, 373 F. 2d 537 (C.A. 8, 1967); Royalton Stone Corp. v. Commissioner, 379 F. 2d 298 (C.A. 2, 1967), affirming a Memorandum Opinion of this Court; Freund v. United States, 367 F. 2d 776 (C.A. 7, 1966); Laudenslager v. Commissioner, 305 F. 2d 686 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 947 (1963). Petitioner emphasizes that the 1963 agreement is denominated "Contract For Sale of Sand, Gravel, and Rock"; the parties are identified as "Vendors" and "Vendees"; the consideration is in terms of "purchase price" and "payments"; the agreement recites that the Vendors "grant, bargain, sell, convey, *138 set over, assign, and deliver" all the "sand, gravel, and rock" from the described land; the agreement also declares that it is "intended that the Vendees will remove all the commercially saleable sand, gravel, and rock"; further, the contract is to "terminate when all the commercially saleable sand, gravel, and rock has been removed, or upon default"; if the agreement is terminated by default, the Vendees are to "reconvey all of the remaining sand, gravel, and rock still in place in the ground." The agreement further declares that "[nothing] in this contract shall be construed as a retention by Vendors of an economic interest in the sand, gravel, and rock in place." These provisions, concededly, are the kind of terms that might well be used in a contract effectuating a purchase and sale of the sand and gravel in place. We have no doubt from the testimony that petitioner and Janes-Prentice used this language with a view to conferring on Janes-Prentice an exclusive right to mine the sand and gravel deposit to exhaustion and to convincing this Court (or some other court) that the transaction should be treated as a sale for tax purposes.[6] But the "determination of whether an economic *139 interest has been retained is not dependent upon the label that is given to the transaction * * *." Laudenslager v. Commissioner, supra, at 690. The determination does not turn on the "formal attributes" of the legal instrument in question, or on its "descriptive terminology" as a sale or lease. Palmer v. Bender, supra, at 555-556; Royalton Stone Corp. v. Commissioner, supra, at 299. It is enough if under the arrangement with Janes-Prentice petitioner retained a right to share in the sand and gravel produced. If so, he retained an economic interest in the sand and gravel in place. And we think it clear from the agreement as a whole that petitioner retained such a right. *140 Petitioner relies upon the minimum annual payments prescribed in paragraph 2 of the lease, quoted in our findings, in support of his contention that he was not required to look solely to the extraction of the sand and gravel for the recovery of his capital. He points out that, although the consideration for the sand and gravel is 25 cents per cubic yard, a minimum payment of $15,000 is to be made each year regardless of the amount of production, and any difference between this sum and a payment measured by production yardage in a particular year can be recouped by Janes-Prentice from amounts otherwise payable only if 876 production in some subsequent year, or years, exceeds 60,000 cubic yards. From this provision petitioner argues that his receipts are not solely from production, but are simply measured by production. But the 1954 agreement contained a similar minimum royalty requirement and the Court of Appeals rejected petitioner's argument that the minimum payment was consideration separate from the royalty payment, citing secs. 1.611-1(b) and 1.612-3(b), Income Tax Regs.; Freund v. United States, supra; Laudenslager v. Commissioner, supra; and Albritton v. Commissioner, 248 F. 2d 49 *141 (C.A. 5, 1957), affirming in part 24 T.C. 903 (1955). Wood v. United States, supra at 307. We must reach the same conclusion here. As pointed out by the court in the Freund case, supra, at 778, "a guaranteed minimum payment coupled with payment measured by production, like a lease bonus coupled with a royalty interest ( Palmer v. Bender, 287 U.S. 551, 53 S. Ct. 225, 77 L. Ed. 489), is to be treated in toto as ordinary income." The present transaction clearly falls within this rule. Petitioner's only substantive return of capital is dependent upon a unit price for an undertermined amount of sand and gravel if, as, and when removed. If Janes-Prentice should make a supplemental payment in one year to bring the total payments to petitioner up to the prescribed minimum of $15,000, the supplemental payment, which would be subject to recoupment in a later year in which production exceeded 60,000 cubic yards, would have the same character as a bonus paid on the execution of the lease and would be treated merely as advance royalty. Bankers' Pocahontas Coal Co. v. Burnet, 287 U.S. 308 (1932); Burnet v. Harmel, 287 U.S. 103 (1932); *142 Otis A. Kittle, 21 T.C. 79, 87-88 (1953), affirmed per curiam, 229 F. 2d 313 (C.A. 9, 1956). Petitioner emphasizes the possibility that production in a subsequent year might never reach 60,000 cubic yards with the result that Janes-Prentice would be required to pay a portion of the guaranteed annual $15,000 minimum payment from his own resources rather than from production. We do not think such a possibility can affect the result here. By 1959 production of sand and gravel had reached a point where petitioner was receiving a sum in excess of $100,000 annually therefrom [7] and, as shown by our findings, this level of production was maintained throughout the years here involved. Janes-Prentice had a very substantial investment in equipment and machinery located on the ranch, which reflects a business judgment that a continuing high level of production was anticipated. We do not think the parties attached independent significance to the minimum royalty provision in the 1963 agreement. To the contrary, we think it far more likely that the provision was merely a carryover from the 1954 agreement where it operated as an incentive to early production. Cf. Hamme v. Commissioner, 209 F. 2d 29, 34-35 *143 (C.A. 4, 1953), affirming a Memorandum Opinion of this Court. Petitioner argues that he did not retain an economic interest in the minerals in place because his receipts were not related solely to payments in kind or to the value of the minerals when produced but to the specified sum of 25 cents per cubic yard for the sand and gravel as removed. The same payment formula was employed in the 1954 agreement and, rejecting the same argument, the Court of Appeals explained that under the economic interest test, "the critical consideration is whether payment is dependent upon extraction, not the method by which that payment is calculated." Wood v. United States, supra, at 306. See also Rabiner v. Bacon, supra, at 539; cf. Bankers' Pocahontas Coal Co. v. Burnet, supra. Petitioner also points to testimony that removal of the sand and gravel rendered the land on which the pits were located useless for ranching purposes and argues that, for this reason, the 1963 transaction should be treated as a sale. But this argument proves too much. The effect of extraction on the land surface is *144 the same under a lease as under a sale. The economic interest test is concerned with interests in the minerals in place, not with the incidental effect of the removal process on the use of the surface of the land. Cf. Schreiber v. United States, supra. We do not think Robert M. Dann, 30 T.C. 499 (1958), turning on its peculiar facts, holds to the contrary. Petitioner relies heavily upon Crowell Land & Min. Corp. v. Commissioner, 242 F. 2d 864 (C.A. 5, 1957), reversing 25 T.C. 223 (1955). We think that case is clearly distinguishable 877 on its facts, and we read Wood v. United States, supra, at 310-311, to say, in effect, that the rule of the Crowell case will be confined to its facts. Nor can we find any comfort for petitioner in the language of Samuel L. Green, supra, at 1069-1070. The test therein stated was merely a concise summary of the holdings of the landmark cases on depletion, most of which are cited above. Indeed, we think that application of the test stated in our Green opinion requires us to conclude, and we here decide, that under the 1963 agreement, petitioner retained an economic *145 interest in the sand, gravel and rock in place. His capital investment must, therefore, be recovered through depletion. See section 613, I.R.C. 1954. Decisions will be entered under Rule 50. Footnotes
1. The petition in Docket No. 6629-65 was filed on November 22, 1965, prior to the death of Gertrude L. Wood, and she was individually named as a petitioner. After her death, Nathaniel Clark Wood, Executor, was substituted as a petitioner.↩
2. The terms of the 1954 agreement are set forth at length in footnote 3 of Wood v. United States, supra, at 302-303↩.
3. The substance of all provisions of the 1963 agreement also appeared in the 1954 agreement with the exception of paragraphs (4) and (15) which are new.↩
4. The 1954 agreement contained the following royalty provisions: (4) First Party agrees to protect the Second Party in the peaceful possession of the premises here let, for the purpose of mining, processing and removing sand, gravel and rock only, for so long as sand, gravel and rock is produced from said land and the First Party receives a minimum of $15,000.00 per year from royalty from sales of sand, gravel and rock and/or supplemental payment by Second Party to produce said annual minimum if royalty payments above are insufficient to meet said annual minimum royalty guarantee. Second Party agrees to pay First Party on October 1, 1955, an advance royalty payment of the same amount he received for the month of October of 1954, and the same amount for each month thereafter as he received the prior year until Second Party begins production and sales to be recovered by Second Party out of royalty becoming due to First Party until recouped. * * * (12) Second Party, in consideration of the rights herein granted by First Party, agrees and obligates himself to pay to First Party, as hereinafter stated, a royalty on each and every cubic yard of sand, gravel and rock mined on and removed from the premises, which royalty shall be twenty-five cents (25") per cubic yard. (13) Royalty payments shall be based on truck measurements at destination or if shipped by railroad, railroad weights to govern and yardage shall be computed on a basis of 2800 lbs. per cubic yard. All material processed shall remain the property of Second Party until removed from premises, and Second Party reserves the right to remove such processed materials after termination of this lease by payment of the cubic yard royalty herein set forth, and the right of ingress and egress to remove said processed materials.↩
5. We note that the 1963 agreement was executed on May 21, 1963, but was to be effective beginning January 1, 1963. In view of our disposition of this case, we need not decide whether this provision is sufficient to obtain the desired tax consequences for the entire year 1963.↩
6. The economic interest test does not turn on the parties' intention, purpose, or motive. "It is difficult to see why one purpose rather than another should be of any consequence in relation to the issue before us, since the question is whether petitioner in fact sold the * * * [sand and gravel] deposits 'in place,' and the answer to that question should not turn upon the motive that prompted them to enter into the transactions under review." Samuel L. Green [Dec. 24,735], 35 T.C. 1065, 1071 (1961); cf. McHarg v. Fitzpatrick [54-1 USTC 9272], 210 F. 2d 792, 794↩ (C.A. 2, 1954).
7. See Wood v. United States, supra, at 303↩.