**W. C. FREY et ux.**

**v.**

**UNITED STATES of America.**

**Civ. A. No. 1126.**

United States District Court
N. D. Texas,
Wichita Falls Division.

Nov. 2, 1957.

R. B. Cannon, Fort Worth, Tex., for plaintiffs.

Charles K. Rice, James P. Garland, Washington, D. C., Heard L. Floore, Fort Worth, Tex., for defendant.

DOOLEY, District Judge.

This suit was brought to recover alleged overpayment of income taxes in the amount of $15,027.38, and there is some novelty in the specific cast of the crucial question. The transaction at the root of this litigation relates to nine oil and gas leases, all dated October 1, 1947, between Frey and wife, as lessors, and the copartnership doing business in the name of G. E. Kadane & Sons, as lessees, and a supplemental contract, of like date, between the same parties. The leases reflect that type of mineral leasing with a cash bonus, and a reserved oil and gas payment in a stated amount, as well as the ordinary lessor's royalty of one-eighth, and the only novel thing about the deal is an option provision in the said supplemental contract, whereby if the lessors so elect the lessees were bound to buy said production payment and pay the specified price therefor on October 1, 1949.

The evidence shows that in the negotiations between the parties previous to the execution of the leases and attendant contract they had to resolve certain competing interests between them in respect to the amount of the cash bonus payment. These leases, covering in round figures 2,880 acres, were on land in wildcat territory. The lessors had the objective of a cash bonus payment in the sum of about $15 per acre, and the lessees wanted to minimize the cash bonus and keep that much more in funds for the expenses of exploratory drilling on the leasehold lands. They finally hit on a solution, which, as a practical alternative, substantially attained the respective aims of the contracting parties, and said

peculiar option was devised as the means to effect such mutually satisfactory arrangement. The lessees were unwilling to pay a present cash bonus of $15 per acre, but would make a cash bonus payment of about $5 per acre and also give a production payment, which, if it paid out, would yield another $22 plus per acre, in other words, over twice the remaining $10 per acre which the lessors had wanted in cash bonus. The lessors thus had the chance to speculate profitably in the venture by the production payment interest and wait on the outcome of drilling operations, but, at the same time, they were bent on making sure that this postponement or unproductive leases must not prevent their recovery eventually of, at least, the original amount of $15 per acre which they wanted at the outset as a bonus payment. The result was that the lessors received an aggregate cash bonus of $15,215, equal to about $5.25 per acre of the leased lands, and also retained the oil and gas production payment in the sum of $62,720 (twice the amount of the sum next mentioned), but said production payment was made subject to the lessors' aforesaid option, which bound the lessees to purchase such production payment interest for the sum of $31,360, equal to some more than $10 per acre, if the lessors so demanded in September of 1949. The time for the exercise of the lessors' option was extended twice at the instance of the lessees, subject to accrual of interest at the rate of 5% per annum, and the last extension carried forward to September 1951. The two extension agreements called for interest as stated above, but the original supplementary contract of the parties, which stipulated for the option feature, made no mention of interest. The fact that it was silent in that respect would naturally follow if there had been no dealing with the subject of interest at that time, but such silence would be equally consistent if an interest factor had been included in the option purchase figure for the two years between October 1, 1947, and October 1, 1949, and it is noteworthy that the sum of $10 per acre, that is $28,800, plus interest thereon at 5% for said two years,

equals $31,680, which is quite close to the option purchase figure of $31,360. Standing alone this might well seem nothing more than a striking coincidence, but taken in context with all of the other circumstances and the testimony of the lessee partner who acted for the partnership in this transaction, it naturally gathers definite significance. In any event, simple arithmetic shows that the cash bonus payment of $15,215 plus $28,800 ($10 X 2880 acres), makes $44,015, and that figures out $15 plus a minor fraction per acre. Of course, the lessors actually collected $15,215 plus $31,360, making $46,575, and that would figure out $16 plus a minor fraction per acre, but it is again true that the last total sum may be inclusive of the potential interest factor as pointed out above. The lessor husband did not testify. The managing partner and the husband acted in negotiating this transaction, and such partner testified that the husband "made it very clear to us that he had in mind a round figure of about $45,000.00 for the overall deal, but, of course, he was not versed enough in the manner in which it should have been handled, and the suggestion as to setting it up as an option with a purchase obligation, I believe, was the result of his attorney's advice; I am not certain about that; that happened ten years ago, but I think that that's the way it came about."

The lessees drilled several dry holes on the lands covered in three of these leases and the last of the drilling was in January 1949. On September 22, 1951, in compliance with the lessors' election and demand, under the option herein mentioned, the lessees performed their purchase obligation satisfactorily to the lessors by making a cash payment in part and by delivery of a note in the other part, and thereupon the lessors made a written sale and conveyance of the aforesaid oil and gas production payment interest to the lessees. The last delay rental payment made by the lessees under the leases in question to extend same another year was on September 27, 1951. The lessees, at the same time they held the leases in question, also owned other

leases in that locality, near enough that operations on the other leases would have some bearing upon the leases here before the Court. Under date of August 10, 1952, the lessees released and surrendered all of the nine leases aforesaid by written instruments filed for record in the proper public office.

The lessors as plaintiffs here contend that the consideration paid to them for the last named sale and conveyance is entitled to long-term capital gain treatment, and, on the other hand, the United States contends that same was in the nature of a delayed or deferred bonus under the income tax law, and, consequently, was ordinary income, but subject to the depletion deduction allowed by the law.

■ The only tenable understanding of the agreement must be that the lessees, like the lessors, had both a speculative and a certain inducement. That is to say the lessors had a chance to collect as much as $62,720 and at the worst a practical certainty to collect $31,360, so that in either event they would realize at least their constant goal of about $15 per acre in bonus. On the other hand, the lessees had the chance, which they doubtless thought was a good prospect, that the leases might prove sufficiently productive so that it would be to the pecuniary interest of the lessors to choose retention of the production payment of $62,720, thus obviating any further payment by lessees of cash consideration from their own money capital, and at the worst the lessees gained the certainty of a delay for two years before they would have to pay the balance of the bonus consideration for the leases. In other words, it all fitted together in neat reciprocal fashion.

There is plain artificiality in saying that the function of the option feature was to effect a real sale of the production payment interest. Unquestionably, the lessees got nothing in the so-called sale, which they would have been willing to buy at a price of $31,360, or even for a small fraction of that sum. It is unnecessary to say that all of the land in the leases had been conclusively condemned from a mineral standpoint by the testing which was done, but certainly any prospects of a production potential had been well deflated and it is surely a fair inference that said production payment had become of negligible value at the most, particularly in view of the cessation of testing under the leases and the fact that the primary term thereof would expire October 1, 1952. The lessees actually released and surrendered the leases in August 1952. The fact is that it was fairly predictable from the outset that if the lessees were ever required to respond under the option agreement they could not expect anything like commensurate value for their money expenditure.

It would be incredible to suggest that any third person, disassociated from the leasing transaction of October 1, 1947, would have been willing to bind himself under the very onerous option agreement to buy the production payment interest at the sole will and pleasure of the lessors for $31,360, unless upon a present, adequate and independent consideration. The only reason that the lessees were willing to bind themselves was that they had adequate inducement and consideration in the implementation of the option agreement with the overall leasing transaction. Their true consideration was that they wanted to acquire these leases and the option provision was a means to that end, that is, a contingent consideration in the very inception of the leases, and that shuts the door on any thought that the consideration to the lessees was the contingency that they might be forced to acquire this production payment interest for $31,360. It would simply strain realities to regard the transaction in question as a true sale taxwise in the face of the factual array. The agreement in question merely introduced a contingency which held in suspense for the time being the eventuality whether the lessors would accept finally the production payment interest as the remainder of the consideration for the leases, or would fall back on the lessees for the balance of the antecedent bonus

sum. When the lessors chose the latter alternative they became bound to abide by the acceptance of what was in all reason delayed bonus money.

The lessors raise the claim that this production payment interest is still an outstanding property right at this time owned by the erstwhile lessees, but the true rule seems to be that a production payment is nothing more than a limited overriding royalty and expires with the termination of the related lease. Rogers National Bank v. Pewitt, Tex.Civ. App., 231 S.W.2d 487 (writ refused). It would be anomalous to think the parties intended that said oil payment interest should survive the leases in question and constitute an outstanding burden against the land, payable at any time, however remote, in the contingency of future oil and gas production on the land, which would mean the possibility of an ultimate payment about one and a third times the whole bonus amount received by the lessors for the aforesaid leases, to say nothing of being an indeterminate handicap against the lessors' title. Indeed, said leases and the supplemental contract, by their terms, refute the position of lessors. In the first place, the leases proper do not contain or make reference to any reservation of an oil payment. This feature is found in the supplemental contract and only in that way is imparted to the leases. The supplemental contract, in the provision covering such reservation of oil payment, links same to "the oil and gas produced and to be produced from said lands so *leased*," and the formal transfer of such oil payment interest from the lessors to the lessees not only similarly links same to "the oil, gas and casinghead gas produced from the said lands so *leased*," but also stipulates that said transfer is "subject, nevertheless, to the other terms and conditions of the respective oil, gas and mining *leases* on said lands." Under certain terms and provisions thereof the leases could be caused to terminate. It is clear enough that the oil payment was bound up with the leases in question and, in the nature of things, lapsed with the termination of the leases.

No case squarely in point either way on the decisive issue between the parties has been cited, but it seems fairly well settled at least that bonus consideration need not be paid, either all or part, in advance at the outset of the transaction and that what in reality is a bonus consideration retains that nature even though it takes the form of a delayed bonus, or bonus payable in installments, and even though it is called "rental". Kleberg v. Commissioner, 43 B.T.A. 277, 292–293; McFaddin v. Commissioner, 2 T.C. 395, 402–404; Kittle v. Commissioner, 21 T.C. 79, 87–89; Burnet v. Harmel, 287 U.S. 103, 112, 53 S.Ct. 74, 77 L.Ed. 199; and State National Bank v. Morgan, 135 Tex. 509, 143 S.W.2d 757. The option provision is not bound to be the last word. The word "sale" is no wand capable of transfiguring the transaction. The Courts will probe for the realities in judging business dealings from a tax standpoint. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596.

In the light of above views, it appears that the deficiency assessments in question were proper and, accordingly, judgment herein will be rendered for the defendant.