OPINION OF THE COURT
Kenneth R. Fisher, J.
*752 Plaintiffs, Robert and Jeanne Moore, move pursuant to CPLR 3212 for an order granting them summary judgment on the fourth cause of action and further dismissing them as defendants with respect to defendant’s counterclaim.
Defendant is the U.S. subsidiary of a global energy firm located in Canada, and natural gas production is a component of defendant’s business. Defendant engages in exploration, drilling, and extractions on land owned by others governed by lease agreements with the landowners. In the case at bar, each plaintiff entered into at least one oil and gas lease with defendant during 2004, with expiration dates in 2009.
The instant litigation arises about lease renewals negotiated in 2008, in anticipation of the 2009 expiration. Due to market conditions at the time and the discovery of plentiful, accessible, high quality natural gas, competition for leases was intense, and it is alleged that landowners were demanding and receiving signing bonuses up to $2,000 per acre in consideration for the gas leases. Each lease provided for payment of 25% of the signing bonus consideration within 90 days of the executed lease, and the remaining 75% payable on the effective date of the lease. Each lease further provided that defendant could unilaterally surrender the leases without giving rise to damages:
“21. SURRENDER
“Lessee may surrender and cancel this Lease at any time as to all or any portion of the Leasehold by recording a Surrender of Lease in the relevant county office, and in the event of a partial surrender, the Rental shall be reduced in proportion to the acreage so surrendered.”
After renewed leases were negotiated, market conditions abruptly changed, and it is alleged that it became apparent that New York’s regulatory environment would not be conducive to widespread drilling. Many gas companies halted their lease acquisition programs as a result. Likewise, defendant solicited plaintiffs to extend its time for payment, or risk having defendant surrender the leases. None of the plaintiffs, including movants Robert and Jeanne Moore, agreed. Months later, defendant surrendered the leases. The crux of this suit centers upon whether plaintiffs are entitled to the consideration bargained for when they entered into the renewals, specifically the 75% secondary payments.
Plaintiffs’ complaint alleges causes of action sounding in breach of contract, with each cause of action stated by a differ *753 ent plaintiff against defendant based upon the secondary payment allegedly due under the leases. The instant motion is made by plaintiffs Robert and Jeanne Moore relative to the fourth cause of action.
The Moores allege that they own 232.62 acres in Newark Valley, Tioga County. (See Moore’s affidavit ¶ 4.) The Moores’ predecessor in title had granted a 10-year oil and gas lease to Central Appalachian Petroleum, providing for an expiration date of June 25, 2009. (Id. ¶ 5.) The parties agree that the Central Appalachian Petroleum lease expired on June 25, 2009. In 2008, before the Central Appalachian Petroleum lease expired, defendant approached the Moores through a land agent about a renewal lease at a proposed $2,000 per acre. (Id. ¶ 6.) After some negotiation, the Moores signed a lease agreement and delivered it to defendant through the land agent. (Id. ¶ 7.) In relevant part, the order of payment attached to the lease agreement states:
“A consideration payment in the amount of One-Hundred Sixteen Thousand Three Hundred ten and 00/100 Dollars $116,310.00 shall be paid within ninety (90) days of Fortuna Energy Inc. receiving an executed original of this order of payment (the ‘Consideration Payment’).
“The amount of Three Hundred Forty Eight thousand Nine Hundred thirty and 00/100 Dollars $348,930.00 shall be paid at the termination of the original oil and gas lease currently of record covering the Leased Acreage or upon the effective date of the Lease, as applicable, (the ‘Secondary Payment’).
“The Consideration Payment and the Secondary Payment shall include the total bonus consideration that shall be paid to the lessor for the Lease and includes the rental payment for the first year of the primary term of the Lease. Fortuna Energy Inc. may surrender and cancel this Lease at any time, with no damages arising therefrom, after the payment of the Consideration Payment by written notice to Robert A. Moore and Jeanne L. Moore that the Lease has been surrendered and no further payments are due and payable thereafter . . .
“The payments described herein are for bonus consideration and unless the Lease is surrendered the rental period, which is 6/25/09 to 6/25/2014, covering 232.62 gross acres which covers property *754 described in the Lease executed this day.” (Complaint, exhibit 1, at 144 [emphasis added].)
Defendant paid the Moores the first bonus consideration installment of $116,310. (See Moore’s affidavit ¶ 8.)
In addition to the payment of the “bonus consideration” set forth in the order of payment, payment terms are also set forth in the lease itself:
“4. PAYMENTS TO LESSOR “(a) Lessee covenants to pay Lessor, proportionate to Lessor’s percentage of ownership in the Leasehold, as follows:
“(i) RENTAL: to pay Lessor a rental at the rate of Five ($5.00) dollars per Leasehold mineral acre per year payable annually on or before a lease year ending on the anniversary date of the date described in clause 3 of this Lease (the ‘Lease Year’) for the next ensuing Lease Year (the ‘Rental’) and continuing thereafter until the commencement of Royalty payment or Shut-In Royalty payments, but in no case shall Rental payments be payable after the expiration of the Primary Term unless all or a portion of the Leasehold is converted to, or is intended to be converted to, gas storage, in which case Lessee shall recommence paying the Rental. Failure to pay the Rental shall not result in automatic termination of this Lease but shall instead be construed as a default under this Lease and subject to the notice provisions contained in clause 11 of this Lease. The Parties agree that the consideration paid to Lessor by Lessee for the grant of this Lease includes the Rental payment for the first year of the Primary Term.
“(ii) ROYALTY: to pay Lessor a royalty in an amount equal to the current market value at the wellhead as and when produced of 13.5% of all oil, gas and the constituents thereof produced, saved, marketed and sold from the Leasehold (the ‘Royalty’). In no event shall the current market value be deemed to be in excess of the value actually received by the Lessee pursuant to a bona fide, arm’s length sale or transaction. Lessee may withhold Royalty payments until such time as the total withheld exceeds twenty-five ($25.00) dollars.
“(b) Notwithstanding anything to the contrary *755 contained in this Lease, if required pursuant to relevant laws, regulations or any agreement, directive or order from any governmental agency or court, Lessee is obligated, directed or ordered to suspend Royalty payments to Lessor, this Lease shall nevertheless remain valid and in full force and effect during such time as if such Royalty payment were being paid directly to Lessor.
“(c) In the event Lessee makes an overpayment of the Royalty, regardless of the reason, Lessee shall be entitled to correct any Royalty overpayments made to Lessor by any legal or equitable means available to Lessee including, but not limited to, the ability to recoup overpayments made to Lessor by setting off future Royalty payments or other payments owing to Lessor, whether or not under the terms of this Lease, against any such overpayments previously made.” (Complaint, exhibit 1, at 135-136.)
The lease agreement further provides for payment of a shut-in royalty. (Id. at 136.)
The term of the lease agreement is stated as follows: “This Lease shall remain in force for a primary term of Five (5) years from 6/25/2009 (the ‘Primary Term’), and for so long thereafter as any of the following occur.” (Id. at 135.) The Moores’ previous lease with Central Appalachian Petroleum (through their predecessor in title) expired by its terms “ten years from June 25, 1999,” or on June 25, 2009, as stated, supra. (See Moore’s affidavit, exhibit 1.)
In March 2009 the Moores state that they received a letter from defendant to which they chose not to respond. (Id. ¶ 9.) The letter stated, in relevant part:
“As a result of these extraordinary and unanticipated events, unfortunately we must inform you that unless you are willing to grant us the right to:
“• Postpone all further lease payments to you and;
“• Extend our option to enter into the Renewal Lease with you,
“we will be forced to initiate its surrender and thereafter retain no further rights or obligations associated with it . . .
*756 “If we do not receive your completed and signed Response Form within thirty (30) days following your receipt of this letter, we will assume that you have elected to reject the terms outlined in this letter and thus consent to the surrender of the Renewal Lease. In that case, Fortuna will initiate surrender of the Renewal Lease and forward to you a copy of the surrender document allowing you to lease your land to another natural gas operator at any time thereafter.” (Complaint, exhibit 1, at 30-31.)
The Moores allege that the secondary payment came due on June 25, 2009, but a check was not received from defendant and defendant has thereafter refused to make the secondary payment. (Id. ¶ 11.) Defendant executed a surrender on November 19, 2009 and filed that instrument on November 24, 2009.
It is well settled that “the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact.” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986] [citations omitted]; see also Potter v Zimber, 309 AD2d 1276 [4th Dept 2003].) “Once this showing has been made, the burden shifts to the nonmoving party to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact that require a trial for resolution.” (Giuffrida v Citibank Corp., 100 NY2d 72, 81 [2003], citing Alvarez, 68 NY2d at 324.) “Failure to make such showing requires denial of the motion, regardless of the sufficiency of the responsive papers.” (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985] [citations omitted]; see also Hull v City of N. Tonawanda, 6 AD3d 1142, 1142-1143 [4th Dept 2004].) When deciding a summary judgment motion, the evidence must be viewed in the light most favorable to the nonmoving party. (See Russo v YMCA of Greater Buffalo, 12 AD3d 1089 [4th Dept 2004].) The court’s duty is to determine whether an issue of fact exists, not to resolve it. (See Barr v County of Albany, 50 NY2d 247 [1980]; Doliendo v Johnson, 147 AD2d 312, 317 [2d Dept 1989].)
Oil and gas leases utilize some terms unique to leases of their genre. Here, the lease agreement is, according to defendant, a “paid-up lease,” meaning that the delay rental payments for the entire primary term of the lease are paid in advance with the bonus consideration. Indeed, the addendum to the lease states: “Lessor and Lessee acknowledge that this is a paid-up lease. Accordingly, no additional delay rentals are owed to Les *757 sor during the primary term hereof.” (Complaint, exhibit 1, at 147; see also Encyclopedia of Mississippi Law § 53:8 [2010] [“These ‘paid up’ leases do not require annual payment of delay rentals. Instead, an amount equivalent to delay rentals that would normally be paid over the primary term is included as a part of the bonus tendered to the lessor upon execution of the lease”].) The bonus paid on a paid-up lease is defined as “ ‘a sum of money paid by a lessee to the lessor in consideration for the execution of a lease, as distinguished from the return of royalty reserved by the lessor to be paid by the lessee through the term of the lease.’ ” (Parmelee v Nueces Royalty Co., 361 SW2d 585, 587 [Tex Civ App 1962], quoting In Griffith v Taylor, 156 Tex 1, 6, 291 SW2d 673, 676 [1956]; see also Wright v Brush, 115 F2d 265, 267 [10th Cir 1940] [“A ‘bonus’ is a consideration in addition to or in excess of that which would ordinarily be given”].) Thus, bonus consideration is “over and above the usual royalty reservation, and it is immaterial whether the additional consideration is paid in money or out of oil, so long as it does not come out of the usual and ordinary royalty reservation to the landowner.” (Id.)
Provision of a bonus consideration provides “both a speculative and a certain inducement” to enter into the paid-up lease, insofar as there is a chance to collect more by way of royalty payments, but at the least, the lessors are entitled to the bonus consideration. (Frey v United States, 159 F Supp 436, 439 [ND Tex 1957].) The United States Supreme Court has observed:
“Under both, the payments made by the lessee are consideration for the right which he acquires to enter upon and use the land for the purpose of exploiting it, as well as for the ownership of the oil and gas; under both the bonus payments are paid and retained, regardless of whether oil or gas is found and despite the fact that all which is not abstracted will remain the property of the lessor upon termination of the lease.” (Burnet u Harmel, 287 US 103, 111 [1932].)
“Delay rentals” are explained as follows:
“[D]elay rentals have long been used in the industry and have a settled meaning. It is customary for parties to an oil and gas lease to agree that a minimum advance royalty shall be paid for the lessee’s right to forego immediate development of the leasehold for production. Such advance minimum payments are in the nature of liquidated damages for the les *758 see’s decision to forego production and are viewed as the consideration paid to the landowner in lieu of the royalty that would be paid if production operations were to be undertaken immediately.” (Jacobs v CNG Transmission Corp., 332 F Supp 2d 759, 785 [WD Pa 2004] [citation omitted].)
Paying delay rentals up front in a “paid-up lease” “relieve[s] [the lessee] of the annual chore of paying delay rentals and does not face the prospect of losing a valuable lease before the primary term expires due to a failure to pay an annual rental.” (Encyclopedia of Mississippi Law § 53:8.) Therefore, the delay rental ensures some payment to lessor even if lessee forgoes (or delays) drilling, thus not giving lessor the opportunity to earn royalty payments under the lease.
“A surrender clause is a lease clause authorizing the lessee to surrender all or part of the leased premises and thereafter be relieved of all obligations as to the acreage surrendered.” (Sohio Petroleum Co. v Grynberg, 757 P2d 1125, 1126 [Colo Ct, App Div I 1988].) In Sohio, the court was presented with a top lease[1] with a surrender clause. The top lease did not reference the payment of bonus consideration. Rather, the bonus consideration was set forth in letters, which bore no indication that the bonus consideration would be reduced if the lessee surrendered acreage covered by the top lease. (Id.) The lessee in Sohio surrendered a portion of the covered acreage, and paid a bonus to lessor for the acreage retained only. (Id. at 1127.) The court in Sohio affirmed a lower court ruling that the lessee “was obligated to pay the entire bonus notwithstanding his release of a portion of the leased premises” before the effective date of the contract.” (Id.)
Here, the parties entered into a paid-up top lease with a surrender clause, as well as an order of payment attached as an addendum requiring the payment of bonus consideration. The parties come before the court for determination of whether the secondary payment of bonus consideration ever came due and payable to the Moore plaintiffs.
The principles of contract interpretation are well settled. “ ‘The best evidence of what parties to a written agreement intend is what they say in their writing.’ ” (Greenfield v Philles Records, 98 NY2d 562, 569 [2002], quoting Slamow v Del Col, *759 79 NY2d 1016, 1018 [1992].) “Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.” (Id.)
“A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing (see, e.g., Mercury Bay Boating Club v San Diego Yacht Club, 76 NY2d 256, 269-270; Judnick Realty Corp. v 32 W. 32nd St. Corp., 61 NY2d 819, 822; Long Is. R.R. Co. v Northville Indus. Corp., 41 NY2d 455; Oxford Commercial Corp. v Landau, 12 NY2d 362, 365). That rule imparts ‘stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses . . . infirmity of memory . . . [and] the fear that the jury will improperly evaluate the extrinsic evidence.’ (Fisch, New York Evidence § 42, at 22 [2d ed].) Such considerations are all the more compelling . . . where commercial certainty is a paramount concern.” (WWW Assoc, v Giancontieri, 77 NY2d 157, 162 [1990]; see also Lee v Tetra Tech, Inc., 14 Misc 3d 1235[A], 2007 NY Slip Op 50312[U], *5 [Sup Ct, Monroe County 2007].)
“Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous.” (South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 278 [2005]; see also Lee, 2007 NY Slip Op 50312[U] at *6.)
There is no ambiguity in any of the documents before the court for consideration. The order of payment unambiguously provides for payment of the secondary payment on June 25, 2009, the date the original lease expired. Defendant denies an obligation to make that payment based upon what defendant alleges was a surrender in the March 2009 letter. The March 2009 letter, however, did not constitute a surrender, but rather advised the Moores of defendant’s intent to surrender if the Moores declined to accept defendant’s solicitation for a payment deadline extension:
“If we do not receive your completed and signed Response Form within thirty (30) days following your *760 receipt of this letter, we will assume that you have elected to reject the terms outlined in this letter and thus consent to the surrender of the Renewal Lease. In that case, Fortuna will initiate surrender of the Renewal Lease and forward to you a copy of the surrender document allowing you to lease your land to another natural gas operator at any time thereafter.” (Complaint, exhibit 1, at 30-31.)
The plain language of the March 2009 letter reveals that it was not a surrender notice; the March 2009 letter was notice of defendant’s intent to surrender if certain conditions were not agreed to by the Moore plaintiffs.
Moreover, the lease specifically defines a “Surrender”:
“Lessee may surrender and cancel this Lease at any time as to all or any portion of the Leasehold by recording a Surrender of Lease in the relevant county office, and in the event of a partial surrender, the Rental shall be reduced in proportion to the acreage so surrendered.” (Complaint, exhibit 1, at 39.)
There is no evidence before the court that defendant recorded an instrument of surrender with the Tioga County Clerk prior to June 25, 2009.
On the papers and proof before the court, the Moore plaintiffs establish prima facie entitlement to summary judgment.
Defendant opposes this motion on three bases.
1. First, defendant contends that it surrendered and cancelled the lease prior to its effective date and prior to the secondary payment becoming due. Defendant argues that the order of payment is an option and that defendant had the right to surrender and cancel the lease without incurring damages after the payment of the consideration payment. (See complaint, exhibit 1, at 144.) Defendant contends that it exercised its right and surrendered and cancelled the lease prior to its effective date by sending the March 2009 letter to the Moore plaintiffs.
Assuming defendant is correct that it could surrender by written notice to the Moore plaintiffs (despite more stringent standards for surrender set forth in the lease agreement), the court must determine whether the March 2009 letter constituted a surrender. The letter states that, unless the Moore plaintiffs grant defendant the right to postpone lease payments and extend the option to enter into the lease, defendant “will be forced to initiate its surrender and thereafter retain no further rights or obligations associated with it.” (Affidavit of D. Mc-Conville, exhibit A.) The letter continues:
*761 “Please understand that should you decide to grant the option period extension we propose, Fortuna does not promise or guarantee that we will elect to enter into the Renewal Lease with you, however we acknowledge by this letter, that the time for us to make that decision will expire at 5:00 PM EDT on May 1, 2010. If by that date and time we have not provided you with out written election to enter into the Renewal Lease, we will initiate its surrender and proceed accordingly by providing you with all required surrender documents.
“If we do not receive your completed and signed Response Form within thirty (30) days following your receipt of this letter, we will assume that you have elected to reject the terms outlined in this letter and thus consent to the surrender of the Renewal Lease. In that case, Fortuna will initiate surrender of the Renewal Lease and forward to you a copy of the surrender document allowing you to lease your land to another natural gas operator at any time thereafter.” (Id. [emphasis added].)
Defendant contends that the March 2009 letter constitutes a “clear statement” whereby defendant “surrendered, cancelled, or rescinded” the lease agreement.
The court disagrees. The fact that the Moore plaintiffs admittedly received, read, and chose not to respond to the March 2009 letter does not mean that defendant successfully surrendered the lease. To the contrary, as succinctly and unambiguously stated in defendant’s own letter, the Moore plaintiffs’ failure to respond meant that defendant would “assume” the Moores consented to a surrender. (Id.) The letter from defendant then continues and states that, given the assumption that the Moores consent to the surrender, defendant “will initiate surrender of the Renewal Lease,” thus freeing the Moores to enter into a lease agreement “at any time thereafter” with another natural gas operator. (Id. [emphasis added].) The implication is clear that the Moores would not be free to enter into a lease agreement with another gas operator until after defendant initiated the surrender, which it never did until November of 2009. The fact that the Moore plaintiffs did not respond to the letter, and implicitly consented to surrender, does not change the terms acknowledged by defendant in its own letter: even after the letter, surrender still had to be initiated by defendant; it was not automatic.
*762 This argument fails to raise a question in response to the Moore plaintiffs’ prima facie case.
2. Next, defendant contends that the motion for summary judgment must be denied because the lease was surrendered by operation of law prior to its effective date and prior to the secondary payment coming due. Defendant relies upon the following, arising in the context of a common leasehold context: “a surrender by operation of law occurs when the parties to a lease do some act so inconsistent with the landlord-tenant relationship that it indicates their intent to deem the lease terminated.” (Riverside Research Inst. v KMGA, Inc., 68 NY2d 689, 691-692 [1986].) Defendant contends that the combination of the order of payment, the March 2009 letter, and the Moore plaintiffs’ acquiescence and failure to respond to the letter served as a surrender of the lease by operation of law on or about April 18, 2009. At the very least, defendant contends there is question of fact as to the availability of this defense.
Again, the court disagrees. Even if the Moores’ failure to respond constituted consent to surrender (and the court notes that defendant was undoubtedly and without question allowed to surrender the lease prior to paying the secondary payment, as set forth in the order of payment), defendant failed to follow through and initiate the surrender it promised would be forthcoming. As such, the lease was never surrendered prior to the secondary payment coming due and the Moore plaintiffs were not free to lease their land to another natural gas operator. This argument also fails to raise a question precluding the Moore plaintiffs’ motion for summary judgment.
3. Finally, defendant contends that the Moore plaintiffs’ motion should be denied for failure to prove damages. Defendant contends that, even if the court determines that the lease agreement became effective on June 25, 2009 and was not surrendered until November 24, 2009, defendant was contractually entitled to reduce its rent payments to plaintiffs in an amount greater than the secondary payment, meaning that the Moore plaintiffs suffered no damages.
The addendum to the lease states, as noted supra, that both parties acknowledge this is a “paid-up lease,” and that “[accordingly, no additional delay rentals are owed to Lessor during the primary term hereof.” (Complaint, exhibit 1, at 148.) The order of payment states that the consideration payment and the secondary payment “shall include the total bonus consideration that shall be paid to the lessor for the Lease and includes the rental payment for the first year of the *763 primary term of the Lease.” (Id. at 144.) The lease agreement states that the rental rate is $5 “per Leasehold mineral acre per year payable annually on or before a lease year ending on the anniversary date of the date described in clause 3 of this Lease.” (Id. at 135.) Here, as 232.62 acres are subject to the leasehold, the annual rental was $1,163.10.
The court notes that the lease, addendum, and order of payment were all drafted by defendant. As such, to the extent an ambiguity arises, it “must be construed against the drafter.” (Guardian Life Ins. Co. of Am. v Schaefer, 70 NY2d 888, 890 [1987]; see also Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc., 63 NY2d 396, 403 [1984].)
An ambiguity in the documents exists because one provision states that this is a paid-up lease (meaning that delay rentals are paid up front), and another provision in the order of payment states that the bonus consideration includes the “rental payment for the first year of the primary term of the Lease.” (Complaint, exhibit 1.) This ambiguity makes it impossible on the facts before the court to determine whether defendant’s November 2009 surrender entitles it to a proportionate share of just one year’s worth of the $1,163 rental payment, or the proportionate share for a year, plus the entire annual payment prepaid for the remainder of the primary term of the lease. The addendum, wherein it states that the lease is a “paid-up lease,” also states: “In the event of a conflict between a provision contained in this Addendum and a provision contained in the Lease, the provision contained in this Addendum prevails.” (Id. at 145.) The difficulty arises, however, because the conflicting term is in the order of payment, which is not specifically referenced in the lease. The order of payment does make reference to the lease, but there is no indication before the court that the terms of the order of payment are incorporated into the lease, thus making a provision affecting the lease equally applicable to the order of payment.
As this narrow issue is ambiguous and cannot be resolved on the papers before the court, summary judgment is denied on the amount of damages pending resolution of the ambiguity. The remainder of the Moore plaintiffs’ motion for summary judgment as to liability is granted.[2]

. “A top lease is a lease granted by a landowner, during the existence of a recorded mineral lease, which is to become effective if and when the existing lease expires or is terminated.” (Sohio, 757 P2d at 1126.)

. The Moores subsequently waived trial of the ambiguity by conceding judgment in the lesser amount.